1  CHRISTOPHER GRIVAKES, State Bar No. 127994
   cg@agzlaw.com
2  DAMION ROBINSON, State Bar No. 262573
   dr@aglzw.com
3  AFFELD GRIVAKES LLP
   2049 Century Park East, Ste. 2460
4  Los Angeles, CA 90067
   Telephone:  (310) 979-8700
5  Facsimile:   (310) 979-8701

6  Attorneys for Plaintiff SETH SHAPIRO

7

8

9              THE UNITED STATES DISTRICT COURT
10         FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

12

13 SETH SHAPIRO, an individual,          **Case No: 2:19-cv-8972**

14              Plaintiff,               **THIRD AMENDED CIVIL**
                                         **COMPLAINT**
15         vs.
                                         **DEMAND FOR JURY TRIAL**
16  AT&T MOBILITY, LLC,
   SEQUENTIAL TECHNOLOGY
17 INTERNATIONAL, LLC., and PRIME
   COMMUNICATIONS, L.P.,
18
              Defendants.
19

20

21

22

23

24

25

26

27

28

                              - 1 -

# I. NATURE OF THE ACTION

1. This action arises out of the repeated failure of AT&T and its agents to protect its wireless cell service subscriber—Seth Shapiro—from its own employees and agents, resulting in massive and ongoing violations of Mr. Shapiro's privacy, the compromise of his highly sensitive personal and financial information, and the theft of approximately $1,921,355.80 in cryptocurrency, valued at considerably more now due to the rise in values since the time of the theft.

2. AT&T is one of the country's largest wireless service providers. Tens of millions of subscribers entrust AT&T with access to their confidential information, including information that can serve as a key to unlock subscribers' highly sensitive personal and financial information.

3. Recognizing the harms that arise when wireless subscribers' personal information is accessed, disclosed, or used without their consent, federal and state laws require AT&T to protect this sensitive information.

4. AT&T also recognizes the sensitivity of this data, and promises its 150 million mobile subscribers that it will safeguard their private information – and particularly their data-rich SIM cards – from any unauthorized disclosure. AT&T promises it "will protect the privacy of our customers," will "safeguard the privacy of [customers'] personal identifying information," and "[will] not sell, trade or share [customers'] CPNI — including [their] calling records — with anyone outside of the AT&T family of companies or with anyone not authorized to represent us to offer our products or services, or to perform functions on our behalf except as may be required by law or authorized by [the customer]."[1] AT&T repeatedly broke these promises.[2]

5. In an egregious violation of the law and its own promises, and despite

---

[1] "Privacy Policy," AT&T, effective June 16, 2006,
web.archive.org/web/20060618204925/http://www.att.com/privacy/policy/, attached hereto as Exhibit A.
[2] On information and belief, the terms of AT&T's Privacy Policy remained similar throughout the duration of his contract. *See* Exhibit A1, "Privacy Policy," AT&T, effective May 2, 2017,
https://web.archive.org/web/20180519020538/http://about.att.com/sites/privacy_policy/full
_privacy_policy

advertising itself as a leader in technological development and as a cyber security-savvy company, AT&T and its representatives and agents repeatedly failed to protect Mr. Shapiro's account and the sensitive data it contained. AT&T failed to implement sufficient data security systems and procedures and failed to supervise its own personnel, instead standing by as its employees used their position at the company to gain unauthorized access to Mr. Shapiro's account in order to rob, extort, and threaten him in exchange for money.

6. AT&T's actions and conduct were a substantial factor in causing significant financial and emotional harm to Mr. Shapiro and his family. But for AT&T employees', representatives' and agents' involvement in a conspiracy to rob Mr. Shapiro, and AT&T's failure to protect Mr. Shapiro from such harm through adequate security and oversight systems and procedures, Mr. Shapiro would not have had his personal privacy repeatedly violated and would not have been a victim of SIM swap theft.

7. Mr. Shapiro brings this action to hold AT&T accountable for its violations of federal and state law, and to recover for the grave financial and personal harm suffered by Mr. Shapiro and his family as a direct result of AT&T's acts and omissions, as detailed herein.

## II. THE PARTIES

8. Plaintiff Seth Shapiro is, and at all relevant times was, a resident of California. Mr. Shapiro currently resides in Torrance, CA, with his wife and two young children.

9. Mr. Shapiro is a two-time Emmy Award-winning media and technology expert, author, and is an adjunct professor at the University of Southern California School of Cinematic Arts. He regularly advises Fortune 500 companies on business development in media and technology.

10. Mr. Shapiro is a former AT&T wireless customer. He purchased a wireless cell phone plan from AT&T in Los Angeles, California in approximately 2006 for personal use and was an active, paying AT&T wireless subscriber at all times relevant

1  to the allegations in this Complaint.

2  11. Defendant AT&T Mobility, LLC (hereinafter, "AT&T") is a Delaware limited

3  liability corporation with its principal office or place of business in Brookhaven,

4  Georgia. AT&T "provides nationwide wireless services to consumers and wholesale

5  and resale wireless subscribers located in the United States or U.S. territories" and

6  transacts or has transacted business in this District and throughout the United States. It

7  is the second largest wireless carrier in the United States, with more than 153 million

8  subscribers, earning $71 billion in total operating revenues in 2017 and $71 billion in

9  2018. As of December 2017, AT&T had 1,470 retail locations in California.[3]

10  12. AT&T provides wireless service to subscribers in the United States. AT&T is a

11  "common carrier" governed by the Federal Communications Act ("FCA"), 47 U.S.C.

12  § 151 et seq. AT&T is regulated by the Federal Communications Commission

13  ("FCC") for its acts and practices, including those occurring in this District.

14  13. AT&T Inc., AT&T's parent company, acknowledged in its 2018 Annual

15  Report that its "profits and cash flow are largely driven by [its] Mobility business"

16  and "nearly half of [the] company's EBITDA (earnings before interest, taxes,

17  depreciation and amortization) come from Mobility."[4]

18  14. Despite the importance of its mobility business, instead of focusing on ramping

19  up security for its customers, AT&T Inc. instead went on an historic acquisition spree

20  costing over $150 billion, acquiring: Bell South (including Cingular Wireless and

21  Yellowpages.com), Dobson Communications, Edge Wireless, Cellular One,

22  Centennial, Wayport, Qualcomm Spectrum, Leap Wireless, DirecTV, and Iusacell and

23  NII Holdings (now AT&T Mexico). During the same period, AT&T's mobile phone

24  business was rated as the worst among major providers. Consumer Reports named it

25  the "worst carrier" in 2010, and the next year, J.D. Power found AT&T's network the

26  least reliable in the country—a dubious achievement that it also earned in prior years.

27

28
[3] "About Us," AT&T, https://engage.att.com/california/about-us/. All URLs in this complaint were last accessed on May 29, 2020.
[4] *Id.*

Little wonder that its customers were the least happy of subscribers of the Big Four carriers according to the American Consumer Index. In the meantime, AT&T Inc. completed the $85.4 billion purchase of Time Warner Inc.—the owner of HBO, Warner Bros, CNN, Turner Broadcasting, Cartoon Network, Turner Classic Movies, TBS, TNT and Turner Sports.

15. Defendant SEQUENTIAL TECHNOLOGY INTERNATIONAL, LLC ("Sequential") is a Delaware Limited Liability Company with its principal place of business in Florida.  Plaintiff is informed and believes and thereon alleges that Sequential acquired the assets and liabilities of Synchronoss Technologies Inc. ("Synchronoss"), which had contracted with AT&T contracted to provide call center services for AT&T's mobile phone customers, and is thus legally responsible for the acts and omissions of Spring as alleged herein.

16. Defendant PRIME COMMUNICATIONS, L.P. ("Prime") is a Texas Limited Partnership with its principal place of business in Sugar Land, Texas.  Plaintiff is informed and believes and thereon alleges that Prime is AT&T's largest authorized dealer in the United States and provided call center services to AT&T.  Plaintiff is informed and believes and thereon alleges that Prime acquired Spring Communications Holdings, Inc. ("Spring") and all of its assets and liabilities, and is thus legally responsible for the acts and omissions of Spring as alleged herein.

17. At all relevant times, Synchronoss and Spring were AT&T's authorized representatives and agents and performed services for AT&T which were within the usual course of AT&T's business.

18. At all relevant times, AT&T dictated and controlled the manner and means by which Synchronoss and Spring performed their services for AT&T.   On information and belief, AT&T entered into a master service agreement with Synchronoss and Spring which governed the terms and condition of AT&T's relationship with Synchronoss and Spring, and which required the Synchronoss and Spring entities to strictly adhere to AT&T's guidelines, protocols, policies, and procedures relating to

customer service, including those relating to SIM swaps.  Furthermore, AT&T controlled the security measures it implemented across its entire network operation (including its own call centers and third-party call centers), as well as the data accumulated across the entire network, to monitor, detect and prevent unauthorized SIM swaps.

19. At all relevant times, Synchronoss and Spring employees identified themselves to Mr. Shapiro as "AT&T" rather than Synchronoss and Spring (at AT&T's direction), had full access to and use of the AT&T customer database which enabled them to perform customer service functions (including SIM swaps), did not disclose that they were employed by Synchronoss and Spring, and were in essence *de facto* employees of AT&T, and at a minimum agents of AT&T at all relevant times.

**III. JURISDICTION AND VENUE**

20. This Court has jurisdiction over this matter under 28 U.S.C. § 1331 because this case arises under federal question jurisdiction under the Federal Communications Act ("FCA"). The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims because the claims are derived from a common nucleus of operative facts. The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Mr. Shapiro is a citizen of a different state than AT&T, Synchronoss and Spring.

21. This Court has personal jurisdiction over AT&T and its contractors Synchroness and Spring because AT&T purposefully directs its conduct at California, transacts substantial business in California (including in this District), has substantial aggregate contacts with California (including in this District), engaged and is engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons in California (including in this District), and purposely avails itself of the laws of California. AT&T had more than 33,000 employees in California as of 2017, and 1,470 retail locations in the state.[5]Mr. Shapiro

[5] "About Us," AT&T California, *supra* at 1.

purchased his AT&T wireless plan in California, visited AT&T retail locations in California, and was injured in California by the acts and omissions alleged herein.

22. In accordance with 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to Mr. Shapiro's claims occurred in this District and Defendant transacts business in this District. Mr. Shapiro purchased his AT&T wireless plan in this District and was harmed in this District, where he resided, by AT&T's acts and omissions, as detailed herein.

## IV. ALLEGATIONS APPLICABLE TO ALL COUNTS

23. As a telecommunications carrier, AT&T is entrusted with the sensitive wireless account information and personal data of millions of Americans, including Mr. Shapiro's confidential and sensitive personal and account information. AT&T's duties to safeguard customer information are non-delegable to any other entity, including its third-party call contractors such as Synchroness and Spring.

24. Despite its representations to its customers and its obligations under the law, AT&T has failed to protect Mr. Shapiro's confidential information. On at least four occasions between May 16, 2018 and May 18, 2019, AT&T employees, representatives and agents obtained unauthorized access to Mr. Shapiro's AT&T wireless account, viewed his confidential and proprietary personal information, and transferred control over Mr. Shapiro's AT&T wireless number from Mr. Shapiro's phone to a phone controlled by third-party hackers in exchange for money. The hackers then utilized their control over Mr. Shapiro's AT&T wireless number— including control secured through cooperation with AT&T employees—to access his personal and digital finance accounts and steal more than $1.9 million from Mr. Shapiro, which is valued much higher today because of the increase in cryptocurrency values.

25. This type of telecommunications account hacking behavior is known as "SIM swapping."

### A. SIM Swapping is a Type of Identity Theft Involving the Transfer of a

**Mobile Phone Number.**

26. A "SIM swap" is a relatively simple scheme, wherein a hacker gains control of a victim's mobile phone number and service in order to intercept communications, including text messages, intended for the victim.  The hackers then use that phone number as a key to access and take over the victim's digital accounts, such as email, file storage, and financial accounts.

27. Most cell phones, including the iPhone owned by Mr. Shapiro at the time of his SIM swaps, have internal SIM ("subscriber identity module") cards. A SIM card is a small, removable chip that allows a cell phone to communicate with the wireless carrier and the carrier to know what subscriber account is associated with that phone. The connection between the phone and the SIM card is made by the carrier, which pairs each SIM card with the physical phone's IMEI ("international mobile equipment identity"), which is akin to the phone's serial number. Without a working SIM card and effective SIM connection, a phone typically cannot send or receive calls or text messages over the carrier network. SIM cards can also store a limited amount of account data, including contacts, text messages, and carrier information, and that data can help identify the subscriber.

28. The SIM card associated with a wireless phone can be changed. If a carrier customer buys a new phone that requires a different sized SIM card, for example, the customer can associate his or her account with a new SIM card and the new phone's IMEI by working with their cell phone carrier to effectuate the change. This allows carrier customers to move their wireless number from one cell phone to another and to continue accessing the carrier network when they switch cell phones. For a SIM card change to be effective, the carrier must authenticate the request and actualize the change. AT&T allows its employees to conduct SIM card changes for its customers remotely or in its retail stores.

29. A SIM swap refers to an unauthorized and illegitimate SIM card change. During a SIM swap attack, the SIM card associated with the victim's wireless account

is switched from the victim's phone to a phone controlled by a third party. This effectively moves the victim's wireless phone—including access to incoming data, texts, and phone calls associated with the victim's phone—from the victim's phone to a phone controlled by the third party (also referred to herein as a "hacker"). The hacker's phone then becomes the only phone associated with the victim's carrier account, and the hacker receives all of the text messages and phone calls intended for the victim.[6] Meanwhile, the victim's phone loses its connection to the carrier network.

30. Once hackers have control over the victim's phone number, they can use that control to access the victim's personal online accounts, such as email and banking accounts, through exploiting password reset links sent via text message to the now-hacker-controlled-phone or the two-factor authentication processes associated with the victim's digital accounts. Two-factor authentication allows digital accounts to be accessed without a password, or allows the account password to be changed. One common form of two-factor authentication is text messaging. Rather than enter a password, the hacker requests that a password reset be sent to the mobile phone number associated with the account. Because the hacker now controls that phone number, the reset code is sent to them. The hacker can then log into, and change the password for, the victim's email, financial and other accounts, allowing them to access the contents of the account.[7]

31. The involvement of a SIM swap victim's wireless carrier is critical to a SIM swap. In order for an unauthorized SIM swap to occur and for a SIM swap victim to

---

[6] As described by federal authorities in prosecuting SIM swap cases, SIM swapping enables hackers to "gain control of a victim's mobile phone number by linking that number to a subscriber identity module ('SIM') card controlled by [the hackers]—resulting in the victim's phone calls and short message service ('SMS') messages being routed to a device controlled by [a hacker]." *United States of America v. Conor Freeman*, No. 2:19-cr-20246-DPH-APP (E.D. Mich. Filed Apr. 18, 2019) (hereafter, "Freeman Indictment"), ECF. No. 1 ¶ 3 (attached hereto as Exhibit B).

[7] *See, e.g., id.* at ¶ 4 ("Once [hackers] had control of a victim's phone number, it was leveraged as a gateway to gain control of online accounts such as the victim's email, cloud storage, and cryptocurrency exchange accounts. Sometimes this was achieved by requesting a password-reset link be sent via [text messaging] to the device control by [hackers]. Sometimes passwords were compromised by other means, and [the hacker's] device was used to received two-factor authentication ('2FA') message sent via [text message] intended for the victim.").

THIRD AMENDED COMPLAINT

1  be at any risk, the carrier must receive a request to change a victim's SIM card and
2  effectuate the transfer of the victim's phone number from one SIM card to another.

3      32. In Mr. Shapiro's case, not only did AT&T employees, representatives and
4  agents access his account and authorize changes to that account without Mr. Shapiro's
5  consent, but its employees actively profited from this unauthorized access by
6  knowingly giving control over his phone number to hackers for the purposes of
7  robbing him.

8      **B. AT&T Allowed Unauthorized Access to Mr. Shapiro's Account Four**
9  **Times Over the Course of Approximately One Year.**

10      33. On four occasions in 2018 and 2019, Mr. Shapiro was the victim of an
11  unauthorized "SIM swap."

12      34. Between May 16, 2018 and May 18, 2019, AT&T employees, representatives
13  and agents accessed Mr. Shapiro's AT&T wireless account without his authorization,
14  obtained his confidential and proprietary personal information, and sold that
15  information to third parties who then used it to steal from Mr. Shapiro, access his
16  sensitive and confidential information, and threaten his family.

17      ***The First SIM swap (May 16, 2018)***

18      35. On May 16, 2018 at approximately 1:35 PM ET, Mr. Shapiro's AT&T SIM
19  card was changed without his knowledge or authorization for the first time.  On
20  information and belief, the first SIM swap was conducted by an employee or agent of
21  AT&T agent Synchronoss.

22      36. At the time of the SIM swap, Mr. Shapiro was attending a conference in New
23  York City. He noticed that his AT&T cell phone had lost service. Mr. Shapiro's
24  device was no longer connected to the AT&T wireless network, and he was no longer
25  able to place or receive wireless calls.

26      37. Mr. Shapiro immediately suspected that a SIM swap attack was underway and
27  called AT&T to secure his account. Mr. Shapiro informed the AT&T customer service
28  agent that he suspected his account had been accessed without authorization and that

he was in possession of large amounts of digital currency, which he feared could be at risk.

38. During his call with AT&T, Mr. Shapiro repeatedly asked to speak to upper management or to be connected to the AT&T department responsible for security. AT&T records confirm Mr. Shapiro's request to speak to the fraud department. Mr. Shapiro was (incorrectly) told that no such department existed, and his call was never escalated to management. Instead, he was put on lengthy holds and ultimately told to turn off his phone and go to an AT&T retail location for further assistance. His AT&T service was then suspended.

39. Immediately upon ending the call with AT&T's customer service, Mr. Shapiro went to an AT&T retail store in Manhattan, New York.[8] On information and belief, the store was owned and operated by AT&T.  Upon arriving, Mr. Shapiro informed AT&T employees, representatives and agents —including an AT&T sales representative, Juneice Arias—that he suspected unauthorized SIM swap activity on his account and once again advised that he had confidential information and digital currency at risk.

40. AT&T employees, representatives and agents told Mr. Shapiro at that time that they had noted the SIM swap activity in his account. Mr. Shapiro implored AT&T for its assurance that it would not allow his mobile phone number to be swapped out again because the financial life or death of his family was at stake. An AT&T employee, representative and agent assured him that they were monitoring his account and that his SIM card would not be swapped again without his authorization. On this assurance, Mr. Shapiro decided not to close his AT&T account.

41. AT&T employees, representatives and agents advised Mr. Shapiro to purchase a new wireless phone with a new SIM card from AT&T. AT&T employees, representatives and agents assured Mr. Shapiro that purchasing a new wireless phone

---

[8] This AT&T retail store is located at 1330 Avenue of the Americas, New York, NY 10019, and is listed on the att.com corporate website as an "AT&T" store.

with a new SIM card would secure his account and prevent additional SIM swap attacks. In reliance on this assurance, Mr. Shapiro purchased a new iPhone for several hundred dollars, as well as a new SIM card, in the AT&T retail store.[9] AT&T employees then activated the new phone and the new SIM card and restored Mr. Shapiro's service, thereby allowing Mr. Shapiro to regain control over his AT&T cell phone number.

### The Second SIM Swap (May 16, 2018)

42. Mere minutes later—while Mr. Shapiro was still in the AT&T retail store—Mr. Shapiro's AT&T account was again improperly accessed, and the SIM card associated with his phone number was changed. Mr. Shapiro again lost control over his AT&T cell phone number.  On information and belief, the first SIM swap was conducted by an employee or agent of AT&T agent Synchronoss.

43. Mr. Shapiro immediately informed AT&T employees, representatives and agents that AT&T had once again allowed an unauthorized SIM swap. Employees informed him that he needed to wait until it was his turn to be assisted.

44. Mr. Shapiro waited for approximately 45 minutes inside the AT&T retail store for help from AT&T employees, representatives and agents. In that time, third-party individuals were able to use their control over Mr. Shapiro's AT&T cell phone number to access Mr. Shapiro's personal and financial accounts and rob him of approximately $1.9 million (and valued much higher today because of the increase in cryptocurrency values), all while Mr. Shapiro stood helplessly in the AT&T store asking for the company's help.

45. While third parties had control over Mr. Shapiro's AT&T wireless number, they used that control to access and reset the passwords for Mr. Shapiro's email accounts, applications, and accounts on cryptocurrency exchange platforms, including KuCoin, Bittrex, Wax, Coinbase, Huobi, Crytopia, LiveCoin, HitBTC, Coss.io, Liqui, and Bitfinex. Cryptocurrency exchanges are online platforms where different forms of

---

[9] "Privacy Policy," AT&T, *supra*, attached hereto as Exhibit A.

cryptocurrency (e.g. bitcoin) are bought and sold.

46. Before the May 2018 SIM swaps, Mr. Shapiro had raised funds in the form of cryptocurrency for a new business venture. This capital, as well as Mr. Shapiro's personal funds, was accessed by the hackers utilizing their control over Mr. Shapiro's AT&T wireless number, although the business funds were stored separately from Mr. Shapiro's personal funds.

47. By utilizing their control over Mr. Shapiro's AT&T cell phone number—and the control of additional accounts (such as his email) secured through that number by utilizing two factor authentication—these third-party hackers were able to access Mr. Shapiro's accounts on various cryptocurrency exchange platforms, including the accounts he controlled on behalf of his business venture. The hackers then transferred Mr. Shapiro's currency from Mr. Shapiro's accounts into accounts that they controlled.[10] In all, they stole more than $1.9 million from Mr. Shapiro in the two consecutive SIM swap attacks on May 16, 2018, which is valued much higher today because of the increase in cryptocurrency values.

48. On information and belief, the hackers also utilized their control over Mr. Shapiro's AT&T wireless number to access and steal Mr. Shapiro's currency on cryptocurrency exchanges (including Liqui.io, Livecoin, and Huobi) to which Mr. Shapiro was never able to regain access.

49. The hackers also used their control over Mr. Shapiro's AT&T cell phone number to access and change the passwords for approximately 15 of Mr. Shapiro's online accounts, including four email addresses, his Evernote account (a web application for taking notes and making task lists), and his PayPal account (a digital payment platform).

50. It took Mr. Shapiro approximately 14 hours to regain access to and restore

---

[10] *See* Affidavit for Search Warrant, *Florida v. Ricky Handschumacher*, No. 18-cf-4271-AXWS (6th Dist. Fl. July 25, 2018) (attached hereto as Exhibit C) at p. 8 (explaining how hackers—including hackers involved in robbing Mr. Shapiro—would "gain access to the victim's email accounts and cryptocurrency exchanges . . . [and] use the victim's funds to purchase cryptocurrencies and transfer it to a accounts [sic] or wallets the [hackers] controlled."). Due to the nature of cryptocurrency, this process makes it extremely difficult to track and seize the location of stolen cryptocurrency.

1  control over his email and other personal accounts. By then, however, the damage was

2  done: these accounts, and all of their contents, had already been compromised.

3      51. Criminal investigations into the May 2018 breaches to Mr. Shapiro's AT&T

4  account and the resulting theft revealed that at least two AT&T employees,

5  representatives and agents, acting in the scope of their employment and agency,

6  accessed and permitted others to access Mr. Shapiro's AT&T account and the

7  confidential information contained therein.[11] As federal authorities describe, "These

8  employees, while not necessarily knowing the entirety of [the hackers] plans, were

9  aware that they were assisting in the theft of identities of subscribers to their

10 employer's services."[12]

11     52. The two AT&T employees, representatives and agents involved, Robert Jack

12 and Jarratt White,[13] reside in Arizona. AT&T confirmed their status as employees,

13 representatives or agents ,[14] their involvement in the unauthorized access of Mr.

14 Shapiro's account,[15] and their involvement in the two SIM swaps that occurred on

15 May 16, 2018.

16     53. Specifically, criminal investigations reveal that a third-party (an individual

17 identified by authorities as "JD") paid Jack and White to change the SIM card

18 associated with Mr. Shapiro's AT&T account from the SIM card in Mr. Shapiro's

19 phone to a SIM card in a phone controlled by JD and others.[16]

20     54. In order to effectuate the swaps, Jack and/or White used their access to Mr.

21 Shapiro's account—access gained through their AT&T employment—to view his

22

23 [11] *See* Criminal Complaint & Affidavit, *United States of America v. Jarratt White*, No. 2:19-mj- 30227-
   DUTY (E.D. Mich. Filed May 2, 2019) (hereafter, "White Affidavit"), ECF No. 1 (attached hereto as Exhibit
24 D).
   [12] *Id.* ¶ 8.
25 [13] *Id.* ¶¶ 10-15 (describing White's involvement in the unauthorized access of Mr. Shapiro's
   AT&T account and the resulting theft) and ¶¶ 16-19 (describing Jack's involvement).
26 [14] *Id.* ¶ 15 ("AT&T confirmed that WHITE was a contract employee from Tucson, Arizona.") and ¶
   16 ("Based on records provided from AT&T, ROBERT JACK, a second AT&T contract employee
27 from Tucson, Arizona . . . .")
   [15] *Id.* ¶¶ 11, 15-16.
28 [16] *Id.* ¶¶ 11, 16-19.

THIRD AMENDED COMPLAINT

confidential AT&T account information and effectuate the SIM swaps without Mr. Shapiro's knowledge or consent.

55. JD paid White $4,300 in exchange for White using his position, knowledge, and authority as an AT&T employee, representative and agent to conduct SIM swaps, including the May 16, 2018 SIM swaps of Mr. Shapiro.[17] White then paid Jack $585.25 for his involvement in the swaps.[18]

56. On information and belief, AT&T data shows that White and Jack were prolific SIM swappers. White conducted 29 unauthorized SIM swaps in May 2018,[19] while Jack conducted 12 unauthorized swaps that same month.[20]

57. Criminal investigations have also identified the AT&T employees', representatives' and agents' third-party co-conspirators and revealed additional information about the employees', representatives' and agents' involvements in the scheme.

58. For example, police officers located documents on the computer of one co-conspirator hacker (identified as "CS1") labeled "ATT Plug."[21] In the SIM swap context, a "plug" is a telecommunication carrier employee who uses their knowledge and access to assist in SIM swaps.

59. Investigators were also able to obtain a log of a chat conversation held online between the third-party co-conspirator hackers, wherein they plotted and executed the theft of Mr. Shapiro's currency.[22]

60. The chat begins with the group discussing working with an AT&T employee, representative and agent to access Mr. Shapiro's AT&T wireless account and swap his SIM card. At 1:19 PM on May 16, 2018, one member of the group asks, "What is plug

---

[17] *Id.* ¶¶ 11-12.
[18] *Id.* ¶ 19.
[19] *Id.* ¶ 15.
[20] *Id.* ¶ 16.
[21] Ex. B at p. 7.
[22] *Id.* at Attachment A.

THIRD AMENDED COMPLAINT

doing[?]"[23]On information and belief, this refers to the group's AT&T plug: White Jack. The same member requests at 1:31 that another member "message [the plug] and tell him hurry up[.]"[24]

61. Beginning at 1:38, a member informs the group that the plug is "doing it [right now]" and then: "It's activated."[25] On information and belief, this refers to Mr. Shapiro's AT&T account being activated on a phone utilized by the hackers – the result of a successful SIM swap effectuated by one or more of the involved AT&T employees, representatives and agents.

62. Once the SIM swap was complete, the group began using their control over Mr. Shapiro's AT&T wireless number to access his personal and financial accounts. At 1:58 and 2:10 PM, the chat log shows the group using Mr. Shapiro's number (which they share over the chat) to access and reset the passwords for his email accounts.[26]

63. At 2:18 PM, the chat log shows the group accessing Mr. Shapiro's Bittrex account and withdrawing his digital currency.[27]

64. The individuals would not have been able to access these accounts but for their utilization of Mr. Shapiro's cell phone number, control of which was obtained through the use of AT&T's employees, representatives and agents and systems.

65. Throughout the chat, the group refers to an additional male individual—the AT&T plug—helping them access Mr. Shapiro's account. At 3:11 PM, one member brags, "my ATT (AT&T) guy . . . Is a supervisor . . . He ain't ever getting fired."[28]

66. The chat also reflects Mr. Shapiro's attempt to regain control of his AT&T account. At 3:39, one member warns that Mr. Shapiro is "trying to get number

---

[23] *Id.* at Attachment A, p. 1.
[24] *Id.* at Attachment A, p. 2.
[25] *Id.* at Attachment A, pp. 2-5.
[26] *Id.* at Attachment A, pp. 5-6
[27] *Id.* at Attachment A, p. 6.
[28] *Id*. at Attachment A, p. 7 (emphasis added).

back."[29] Another—referring to the AT&T co-conspirator—ask whether he wants "[his] guy to swap it back?"[30] At the end of the chat, a group member brags that they "made 1.3 [million]" and they begin plotting about how to route the stolen cryptocurrency through various accounts and currencies in order to cover their trail.[31] They also brag about plans to "buy some Gucci" or a "dream car" with the money they stole from Mr. Shapiro.[32]

67. As these hackers and AT&T employees, representatives and agents stole Mr. Shapiro's life savings and made plans to spend it on luxury goods, Mr. Shapiro was still standing in the AT&T retail store in Manhattan, NY, asking AT&T for help. He was told to wait as his accounts were drained and his personal information compromised.

68. After the May 2018 SIM swaps, AT&T employees, representatives and agents told Mr. Shapiro that his account would be safe from future attacks because they had put a note on his account that would prevent any future SIM swaps.

69. Mr. Shapiro also changed his AT&T account passcodes on the advice of AT&T employees, representatives and agents. AT&T informs its customers that these account passcodes— which are different than account sign-in passwords or the passcodes used to access a wireless device—are used to protect their wireless accounts and may be required when a customer manages their AT&T account online or in an AT&T store.[33] AT&T employees, representatives and agents represented to Mr. Shapiro that this passcode would not be shared with anyone, and would protect his account from future unauthorized SIM swaps. Mr. Shapiro decided not to close his AT&T account in reliance on these assurances.

### *The Third SIM swap (November 1, 2018)*

70. Mr. Shapiro's trust in AT&T was misplaced. On November 1, 2018, Mr.

---

[29] *Id.* at Attachment A. p. 8.
[30] *Id.*
[31] *Id.* at Attachment A. p. 10.
[32] *Id.* at Attachment A. p. 9.
[33] "Get info on passcodes for wireless accounts," AT&T, https://www.att.com/esupport/article.html#!/wireless/KM1049472?gsi=tp3wtr.

Shapiro again noticed that his cell phone had lost service and suspected a SIM swap. Shortly thereafter, he received an alert that someone had accessed and changed the password to—at minimum—his Google email accounts. This also caused all information stored in this account—including sensitive and confidential personal, financial, and legal information—to be compromised.

71. Mr. Shapiro contacted AT&T and confirmed that he had indeed been SIM swapped a third time. Again, AT&T employees, representatives and agents represented to Mr. Shapiro that they had taken steps to prevent any further SIM swaps on his account.  On information and belief, the third SIM swap was conducted by AT&T agent Spring, which was thereafter acquired by Defendant Spring.

72. On May 14, 2019, Mr. Shapiro received a letter from AT&T's Director of Compliance, Nena M. Romano, informing him that "an employee of one of [AT&T's] service providers accessed [Mr. Shapiro's] Customer Proprietary Network Information [CPNI] without authorization."[34] The letter did not indicate which of the three prior SIM swap attacks it concerned. It stated that AT&T had "taken appropriate action" regarding the AT&T employee, representatives and agents involved and had "notified federal law enforcement concerning the unauthorized access of your CPNI as required by Federal Communications Commission regulations."

### *The Fourth SIM swap (May 18, 2019)*

73. Despite these assertions, Mr. Shapiro was SIM swapped for a fourth time on May 18, 2019, at approximately 10:45 PM. Again, Mr. Shapiro lost AT&T service and begun receiving alerts that the passwords for his personal digital accounts had been changed.

74. Mr. Shapiro immediately contacted AT&T customer service. After several long holds and Mr. Shapiro's repeated requests, his call was elevated to an AT&T supervisor. The supervisor, Marcus[35] informed Mr. Shapiro that he had been SIM swapped again but refused to tell Mr. Shapiro who had authorized the swap. On

---

[34] Attached hereto as Exhibit E.
[35] The AT&T employees with whom Mr. Shapiro spoke refused to provide their last names.

THIRD AMENDED COMPLAINT

information and belief, the fourth SIM swap was conducted by AT&T agent Spring, which was thereafter acquired by Defendant Spring.

75. Mr. Shapiro asked the supervisor why the secret passcode that AT&T had promised him would protect his account failed to provide that protection. The AT&T supervisor refused to provide an answer.

76. The supervisor then informed Mr. Shapiro that he would request that his AT&T account be transferred back to Mr. Shapiro's phone. He estimated this would take between 2 and 4 hours. Meanwhile—upon information and belief— hackers continued to have control over his AT&T wireless account throughout that time, and used that control to access his personal and financial accounts.

77. Mr. Shapiro repeatedly asked the supervisor to escalate his call to a higher authority at AT&T. Eventually, he was transferred to an AT&T manager, Tom. The manager informed him that in order to "reverse the unauthorized SIM card change," he would need to "file a ticket" to submit a reversal request—which "normally completes within 2 to 4 hours." He told Mr. Shapiro that he would sever the line in the meantime. It took the manager several minutes to "process" the ticket requesting a reversal. He then informed Mr. Shapiro that AT&T would send a pin code to another active line on his AT&T account to validate the reversal request. This required Mr. Shapiro to get his 12-year-old daughter out of bed, after midnight, to use her phone to receive the pin code. The manager told Mr. Shapiro they would "investigate" how his "account got compromised."

78. During this attack, Mr. Shapiro's Yahoo, Google, Windows, PayPal, Coinbase, and Evernote accounts—at minimum—were accessed and their contents compromised. The hacker changed the passwords on his Evernote, PayPal, Coinbase, and Gmail accounts (temporarily locking Mr. Shapiro out of the accounts), changed the recovery email for his Gmail account to an email they controlled, and deleted his Gmail security question. This also caused all information stored in these accounts— including sensitive and confidential person, financial, and legal information—to be

compromised.

79. On July 19, 2019, Mr. Shapiro received another letter from AT&T's Director of Compliance, Nena M. Romano, informing him that, once again, "an employee of one of [AT&T's] service providers accessed [Mr. Shapiro's] Customer Proprietary Network Information (CPNI) without authorization."[36] The letter did not indicate which of the four SIM swap attacks it concerned. It stated that AT&T had "taken appropriate action" regarding the AT&T employee, representative and agent involved and had "notified federal law enforcement concerning the unauthorized access of your CPNI as required by Federal Communications Commission regulations."

80. On September 6, 2019, Mr. Shapiro received a third letter from Ms. Romano, informing him that "an unknown and unauthorized person gained access to [Mr. Shapiro's] Customer Proprietary Network Information (CPNI) without authorization."[37] Once again, the letter did not indicate which of the four SIM swap attacks it concerned. It stated that AT&T had "moved quickly to disable system access to the unauthorized person" and had "notified federal law enforcement concerning the unauthorized access of your CPNI as required by Federal Communications Commission regulations."

81. The SIM swaps have exposed Mr. Shapiro and his family to ongoing threats of physical harm and extortion. On February 10, 2019, Mr. Shapiro received—on the same AT&T wireless line that had been hacked—text message threats from an

[36] Attached hereto as Exhibit F.
[37] Attached hereto as Exhibit G.

THIRD AMENDED COMPLAINT

Hello Seth Shapiro, I'm contacting you regarding a request. It's very simple and straightforward. To put in perspective, I have access to all of your sensitive personal information which I can use to my advantage. All I ask is that you comply and my demands are met and you will suffer no financial or physical loss. I have an AT&T rep ready to hand over your account to me at any given time so long as you don't follow through. I know where you live, I know who your family is, and I'm not looking to spread any harm your way. All I ask is that you forward $800 to this Cashapp cashtag: $poxs and we will not proceed in seizing your accounts. You have 24 hours to respond, in which there is literally nothing you can do in order to prevent it from happening unless you do as asked. If you choose to ignore this or don't take us seriously, we will proceed in

we will proceed in

Today 11:32 AM

I changed my mind, you honesty have 2 hours remaining dude. If you think i'm playing I will literally fuck you over. Your choice.

Honestly*

Los Angeles, CA 90334

*Figure 1*

anonymous individual (set forth below in Figure 1).

82. This individual knew Mr. Shapiro's name and AT&T wireless number and warned that they had "access to all of [his] sensitive personal information[.]" The harasser also threatened an additional SIM swap and informed Mr. Shapiro that they still had access to AT&T employees, representatives and agents who would aid them in further harm against Mr. Shapiro. Specifically, they warned that they had "an AT&T rep ready to hand over [Mr. Shapiro's] account to [them] at any given time[.]"

THIRD AMENDED COMPLAINT

1   They warned that they knew where Mr. Shapiro and his family lived—and sent his

2   exact current address (redacted below)—and demanded $800 to prevent harm to Mr.

3   Shapiro and his family.

4   83. After Mr. Shapiro received these threats, a sergeant at the Santa Clara County

5   Sherriff's Office informed Mr. Shapiro that he had personally contacted AT&T to

6   inform them of the threats and requested that they monitor Mr. Shapiro's accounts.

7   Despite this warning, Mr. Shapiro's account was authorized without his consent, and

8   his SIM card swapped, approximately 3 months later.

9   84. The financial and personal lives of Mr. Shapiro and his family have been

10   devastated as a result of AT&T's failure to safeguard Mr. Shapiro's account.

11   85. As a result of the May 2018 hacks detailed above, Mr. Shapiro lost more than

12   $1.9 million in digital currency, valued much higher today because of the increase in

13   cryptocurrency values. This money included the entirety of the profits from the sale of

14   Mr. Shapiro's family home and his life savings.

15   86. The financial strain resulting from the robbery of Mr. Shapiro has caused

16   extreme anxiety and distress for Mr. Shapiro and his family.

17   87. Mr. Shapiro's wife, who previously took full time care for their young child,

18   has had to return to work due to the financial strain and pressure. As a consequence of

19   the SIM swap attacks, she has suffered from anxiety, emotional distress, and loss of

20   sleep and has had less time to see to the needs of her children.

21   88. Mr. Shapiro's two children have also suffered. Mr. Shapiro had to undertake

22   the difficult task of explaining the theft to his four-year-old child, who now expresses

23   fear of hackers and robbers and feelings of instability. The Shapiros also have a

24   medically fragile child, who has suffered emotional distress as a result of the financial

25   and emotional strain on the family. Both children require medical treatment as a result

26   of the SIM swap attacks, and Mr. Shapiro has had to pay for that treatment out of

27   pocket.

28   89. Mr. Shapiro has experienced immense harm as a result of the SIM swaps. He

has suffered from anxiety, loss of sleep, and extreme depression. The emotional and financial consequences have also caused marital stress. Mr. Shapiro has had to seek extended professional medical help as a result.

90. The digital currency stolen during the SIM swap attacks also included cryptocurrency raised by Mr. Shapiro for a business venture. As a result of the theft, Mr. Shapiro had to end the venture and lay off all employees. He intends to repay each of the investors the amount they invested in the project which was stolen during the SIM swap attacks. He also suffered professional reputational damages when the venture ended, and investments were lost as a result of the theft.

91. Mr. Shapiro and his family's highly sensitive and confidential personal, legal, and business information have also been compromised as a result of the SIM swaps. This includes color copies of their passports, their social security numbers, their TSA numbers, password and log-in information for additional accounts, and confidential financial, business, and legal information. All of this information is now at a high risk of being posted or bought and sold on the dark web by criminals and identity thieves, putting Mr. Shapiro, his wife, and two young children at ongoing risk of significant privacy violations, extortion, identity theft, and countless unknown harms.

**C. AT&T's Repeated Failures to Protect Mr. Shapiro's Account from Unauthorized Access Are a Violation of Federal Law.**

92. AT&T is the world's largest telecommunications company and provider of mobile telephone services. As a common carrier,[38] AT&T is governed by the Federal Communications Act of 1934, as amended ("FCA"),[39] and corresponding regulations passed by the FCC.[40]

93. Recognizing the sensitivity of data collected by cell carriers, Congress, through the FCA, requires AT&T to protect Mr. Shapiro's sensitive personal information to which it has access as a result of its unique position as a telecommunications carrier.[41]

---

[38] 47 U.S. Code § 153(51).
[39] 47 U.S.C. § 151 *et seq.*
[40] 47 C.F.R. § 64.2001 *et seq.*
[41] 47 U.S.C. § 222.

94. Section 222 of the FCA, which became part of the Act in 1996, requires AT&T to protect the privacy and security of information about its customers. Likewise, Section 201(b) of the Act requires AT&T's practices related to the collection of information from its customers to be "just and reasonable" and declares unlawful any practice that is unjust or unreasonable.[42]

95. AT&T's most specific obligations to protect its customers concerns a specific type of information, called CPNI.[43] CPNI is defined as "information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and . . . information contained in the bills pertaining to telephone exchange service or telephone toll service received by a customer of a carrier."[44]

96. The FCA recognizes the privacy interest in CPNI and "requires telecommunications carriers to take specific steps to ensure that CPNI is adequately protected from unauthorized disclosure."[45]

97. Carriers such as AT&T are liable for failures to protect their customers' unauthorized disclosures.[46] The FCC has also stated that "[t]o the extent that a carrier's failure to take reasonable precautions renders private customer information unprotected or results in disclosure of individually identifiable CPNI, . . . a violation of section 222 may have occurred."[47]

---

[42] 47 U.S.C. § 201(b).
[43] 47 U.S.C. § 222(a).
[44] 47 U.S.C. § 222(h)(1).
[45] Report and Order and Further Notice of Proposed Rulemaking, *In the Matter of Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information*, 22 F.C.C. Rcd. 6927 ¶ 1 (April 2, 2007) (hereafter, "2007 CPNI Order").
[46] 47 U.S.C. §§ 206, 207.
[47] Declaratory Ruling, *In the Matter of Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Information & Other Customer Information*, 28 F.C.C. Rcd. 9609 ¶ 30 (2013) (hereafter, "2013 CPNI Order").

98. As AT&T admitted to Mr. Shapiro in its three letters, [48] his CPNI was breached by AT&T employees, representatives and agents or "unknown and unauthorized person[s]" when they accessed his account and swapped his SIM card without authorization. In each letter, AT&T informed Mr. Shapiro that "an employee of one of [its] service providers accessed [his] Customer Proprietary Network Information (CPNI) without authorization."[49]

99. When employees, representatives and agents accessed Mr. Shapiro's account, his CPNI was visible. On information and belief, this includes, but was not limited to, information about the configuration, type, and use of his subscribed AT&T services, his personal information, his SIM card details, and his billing information. AT&T employees, representatives and agents then used this information to effectuate an unauthorized SIM swap.

100. This type of unauthorized use of Mr. Shapiro's CPNI is illegal under the FCA. The FCA forbids AT&T from "us[ing], disclos[ing], or permit[ting] access to" CPNI, except in limited circumstances.[50] As AT&T admitted in its May 2019 letter, this extends to the carrier's own employees, representatives and agents.

101. AT&T may only use, disclose, or permit access to Mr. Shapiro's CPNI: (1) as required by law; (2) with his approval; or (3) in its provision of the telecommunications service from which such information is derived, or services necessary to or used in the provision of such telecommunications service.[51] Beyond such use, "the Commission's rules require carriers to obtain a customer's knowing consent before using or disclosing CPNI."[52]

102. AT&T failed to protect Mr. Shapiro from authorized use of his CPNI. AT&T permitted its employees, representatives and agents to use and/or disclose Mr. Shapiro's CPNI without obtaining Mr. Shapiro's knowing consent beforehand. AT&T

---

[48] *See.* Exs. E & F.
[49] *Id.*
[50] 47 U.S.C. § 222(c)(1).
[51] 47 U.S.C. § 222.
[52] 2007 CPNI Order ¶ 8 (emphasis added).

employees, representatives and agents, acting within the scope of their employment, likewise did not seek Mr. Shapiro's knowing consent before using, disclosing, and/or permitting access to his CPNI when they accessed his account and swapped his SIM card. Because such conduct does not fit within the FCA's recognized legitimate uses, it constitutes a violation of the FCA.

103. Pursuant to the FCA, the FCC has developed comprehensive rules concerning AT&T's obligations under its duty to protect customers' CPNI.[53] This includes rules "designed to ensure that telecommunications carriers establish effective safeguards to protect against unauthorized use or disclosure of CPNI."[54] The FCC specifically recognizes that "[a]bsent carriers' adoption of adequate security safeguards, consumers' sensitive information . . . can be disclosed to third parties without consumers' knowledge or consent."[55] In a 2013 order, the FCC "clarif[ied] existing law so that consumers will know that *their carriers must safeguard these kinds of information so long as the information is collected by or at the direction of the carrier and the carrier or its designee[56] has access to or control over the information."[57]

104. Pursuant to these rules, AT&T must "implement a system by which the status of a customer's CPNI approval can be clearly established prior to the use of CPNI."[58] AT&T is also required to "design their customer service records in such a way that the status of a customer's CPNI approval can be clearly established."[59] The FCC's rules also "require carriers to maintain records that track access to customer CPNI records."[60]

---

[53] *See* 47 CFR § 64.2001("The purpose of the rules in this subpart is to implement section 222 of the Communications Act of 1934, as amended, 47 U.S.C. 222."). The FCC also regularly releases CPNI orders that promulgate rules implementing its express statutory obligations. *See* 2007 CPNI Order and 2013 CPNI Order.

[54] 2007 CPNI Order ¶ 9; *see also Id.* at ¶ 35; 47 U.S.C. § 222(c); 47 C.F.R. § 64.2009.

[55] *Id.*

[56] In the ruling, "designee" is defined as "an entity to which the carrier has transmitted, or directed the transmission of, CPNI or is the carrier's agent." *Id.* n. 1.

[57] *Id.* at ¶ 1 (emphasis added).

[58] 2007 CPNI Order ¶¶ 8-9 (emphasis added); *see also* 47 C.F.R. § 64.2009(a).

[59] *Id.* ¶ 9.

[60] *Id.*

105. Upon information and belief, AT&T has failed to implement such a system. The fact that Mr. Shapiro's account was accessed without his authorization on at least four separate occasions demonstrates AT&T's failures in this regard.

106. AT&T's failures are particularly egregious because Mr. Shapiro contacted AT&T following each SIM swap attack and provided specific instructions that employees, representatives and agents were not to access his CPNI without his express, prior approval, as established through the use of passcodes. Mr. Shapiro was told that specific warnings would be placed on his account to this affect. These instructions and warnings were ineffective, as shown by the repeated breaches of Mr. Shapiro's account.

107. AT&T is also required to "train their personnel as to when they are and are not authorized to use CPNI, and carriers must have an express disciplinary process in place."[61]

108. Upon information and belief, AT&T has failed to properly train and supervise their personnel, as reflected by AT&T employees', representatives' and agents' involvement in Mr. Shapiro's breaches.

109. Carriers must "maintain a record of all instances where CPNI was disclosed or provided to third parties, or where third parties were allowed access to CPNI."[62]

110. Upon information and belief, AT&T has failed to maintain such a record, as demonstrated by its repeated failure to protect Mr. Shapiro after his CPNI was provided to third-parties.

111. AT&T has also breached its duty to safeguard Mr. Shapiro's CPNI from data breaches, in violation of Section 222(a) and Section 201(b) of the FCA.

112. The FCC has "[made] clear that carriers' existing statutory obligations to protect their customers' CPNI include[s] a requirement that carriers take reasonable steps, which may include encryption, to protect their CPNI databases from hackers

[61] 47 C.F.R. § 64.2009(b).
[62] *Id.*; *see also* 47 C.F.R. § 64.2009(c).

1   and other unauthorized attempts by third parties to access CPNI."[63]

2   113. AT&T failed to take reasonable steps to protect Mr. Shapiro's CPNI, thereby

3   allowing third-party hackers to access his CPNI on at least four occasions.

4   114. The FCC also requires that carriers inform customers – and law enforcement

5   – "whenever a security breach results in that customer's CPNI being disclosed to a

6   third party without that customer's authorization."[64] This requirement extends to any

7   unauthorized disclosure.

8   115. In adopting this requirement, the FCC rejected the argument that it "need not

9   impose new rules about notice to customers of unauthorized disclosure because

10  competitive market conditions will protect CPNI from unauthorized disclosure."[65]

11  116. Instead, the FCC found that "[i]f customers and law enforcement agencies are

12  unaware of [unauthorized access], unauthorized releases of CPNI will have little

13  impact on carriers' behavior, and thus provide little incentive for carriers to prevent

14  further unauthorized releases. By mandating the notification process adopted here, we

15  better empower consumers to make informed decisions about service providers and

16  assist law enforcement with its investigations. This notice will also empower carriers

17  and consumers to take whatever 'next steps' are appropriate in light of the customer's

18  particular situation."[66] The FCC specifically recognized that this notice could allow

19  consumers to take precautions or protect themselves "to avoid stalking or domestic

20  violence."[67]

21  117. AT&T failed in its duty to safeguard Mr. Shapiro's CPNI from breaches and,

22  upon information and belief, has failed to properly inform him of such breaches when

23  they occurred. Mr. Shapiro only received any documentation alerting him that his

24  CPNI had been breached after the third hack; he received no such notice following the

25

26  [63] 2007 CPNI Order ¶ 36 (citation omitted).
    [64] 2007 CPNI Order ¶ 26; *see also* 47 C.F.R § 64.2011(c).
27  [65] 2007 CPNI Order ¶ 30.
    [66] *Id.*
28  [67] *Id.* at n.100.

THIRD AMENDED COMPLAINT

first two SIM swap attacks. Additionally, he only received documentation for three out of four total attacks.

118. Under the FCA, AT&T is not just liable for its own violations of the Act, but also for violations that it "cause[s] or permit[s]."[68] By failing to secure Mr. Shapiro's account and protect his CPNI, AT&T caused and/or permitted Mr. Shapiro's CPNI to be accessed and used by its own employees and by third-party hackers.

119. AT&T is also responsible for the acts, omissions, and/or failures of officers, agents, employees, or any other person acting for or employed by AT&T, including employees, representatives and agents Jack and White.

**D. Mr. Shapiro's Harm was Caused by Defendants' Negligence.**

120. Defendants were negligent in numerous respects: (1) AT&T was negligent, grossly negligent or reckless in (a) hiring, training and supervising its agents Synchronoss and Spring, (b) hiring, training and supervising its own retail employees who forced Mr. Shapiro to wait for a considerable time while he was being SIM swapped, (c) failing to implement readily available technology solutions and other measures to prevent SIM swaps, and (d) instead seeking to profit from the SIM swap problem by focusing on developing a post-SIM swap solution as set forth in detail below; (2) Synchronoss was negligent, grossly negligent or reckless in hiring, training and supervising its employees or agents Jack and White who were involved in the conspiracy to defraud Mr. Shapiro; and (3) Spring (now Spring) was negligent, grossly negligent or reckless in hiring, training and supervising its employees or agents involved in the third and fourth SIM swaps of Mr. Shapiro.

121. By failing to secure Mr. Shapiro's account—and protect the confidential and sensitive data contained therein—and to properly hire, train, and supervise their employees, representatives and agents, Defendants are responsible for the foreseeable

---

[68] *See* 47 U.S.C.A. § 206 (establishing that "[i]n case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter[.]")

harm Mr. Shapiro suffered as a result of Defendants' gross negligence or reckless conduct.  Further, Defendants are responsible for their representatives' and agents' failure to obtain Mr. Shapiro' valid consent before accessing his account and effectuating a SIM swap, as such actions were within the scope of their agency or employment with Defendants.  On information and belief, Defendants' representatives and agents were tasked with and able to change customers' SIM card numbers at will – even when such changes violated AT&T company policy. Additionally, Defendants representatives' and agents' breach of Mr. Shapiro's account and the subsequent SIM swap was foreseeable.  AT&T has known for more than a decade that third parties frequently attempt to access and take over mobile customers' accounts for fraudulent purposes.

122. Further, AT&T is responsible for its employees', representatives' and agents' participation in the conspiracy to rob Mr. Shapiro, as such actions were within the scope of their employment with AT&T. On information and belief, AT&T employees, representatives and agents were tasked with and able to change customers' SIM cards.

123. Additionally, AT&T employees' breach of Mr. Shapiro's account and the subsequent SIM swaps were foreseeable. AT&T knew or should have known that Mr. Shapiro's account was at risk, but nonetheless failed to secure his account and failed to properly hire, supervise and train its employees, representatives and agents.

124. AT&T has known for more than a decade that third parties frequently attempt to access wireless customers' accounts for fraudulent purposes. In 2007, the FCC issued an order strengthening its CPNI rules in response to the growing practice of "pretexting."[69] Pretexting is "the practice of pretending to be a particular customer or other authorized person in order to obtain access to that customer's call detail or other private communication records."[70] This 2007 Order put AT&T on notice that its customers' accounts were vulnerable targets of the third-parties seeking unauthorized access.

---

[69] 2007 CPNI Order.
[70] *Id.* ¶ 1.

125. AT&T also knew, or should have known, about the risk SIM swap crimes presented to its customers. SIM swap crimes have been a widespread and growing problem for years. The U.S. Fair Trade Commission ("FTC") reported in 2016 that there were 1,038 reported SIM swap attacks per month in January 2013, which increased sharply to 2,658 per month by January 2016—2.5 times as many.[71] The FTC reported that SIM swaps represented 6.3% of all identity thefts reported to the agency in January 2016, and that such thefts "involved all four of the major mobile carriers" – including AT&T.[72]

126. AT&T knew or should have known that it needed to take steps to protect its customers. The FTC's 2017 Report stated that "mobile carriers are in a better position than their customers to prevent identity theft through mobile account hijacking[.]"[73] The FTC urged carriers such as AT&T to "adopt a multilevel approach to authenticating both existing and new customers and require their own employees as well as third-party retailers to use it for all transactions."[74] The FTC also specifically warned carriers, including AT&T, of the risk that, due to text message password reset requests and two-factor authentication, SIM swapping put subscribers at risk of financial loss and privacy violations:

> Having a mobile phone account hijacked can waste hours of a victim's time and cause them to miss important calls and messages. However, this crime is particularly problematic due to the growing use of text messages to mobile phones as part of authentication schemes for financial services and other accounts. The security of two factor authentication schemes that use phones as one of the factors relies on the assumption that someone who steals your password has not also stolen your phone number. *Thus, mobile carriers and third-party retailers need to be vigilant in their authentication practices*

---

[71] Lori Cranor, FTC Chief Technologist, "Your mobile phone account could be hijacked by an identity thief," Federal Trade Commission (June 7, 2016), https://www.ftc.gov/newsevents/blogs/techftc/2016/06/your-mobile-phone-account-could-be-hijacked-identity-thief (hereafter, "2017 FTC Report").
[72] *Id.*
[73] *Id.* (emphasis added).
[74] *Id.*

*to avoid putting their customers at risk of major financial loss and having*
*email, social network, and other accounts compromised.[75]*

127. AT&T admitted it was aware of SIM swap crimes and the effect they could have on its customers in September 2017 when AT&T's Vice President of Security Platforms published an article on AT&T's "Cyber Aware" blog about SIM swaps.[76] In the article, AT&T acknowledged that subscribers with "valuable accounts that are accessible online" are likely targets of SIM swaps. AT&T recommended that its customers set up passcodes that would provide "extra security." These passcodes repeatedly failed to protect Mr. Shapiro.

128. AT&T therefore knew that its customers' accounts were at risk at least 8 months before any breaches of Mr. Shapiro's account. At the time of his first attack in May 2018, Mr. Shapiro informed AT&T—both on the phone and in person—that he had valuable online accounts, thereby making him the type of individual that AT&T recognized was specifically vulnerable to SIM swap attacks. Nonetheless, AT&T failed to take reasonable steps to protect his account.

129. AT&T's inadequate security procedures are particularly egregious in light of AT&T's repeated public statements about the importance of cyber security and its public representations about its expertise in this area. AT&T has an entire series on its public YouTube channel ("AT&T ThreatTraq") dedicated to discussing and analyzing emerging cybersecurity threats.[77] In its videos, AT&T describes itself as a "network that senses and mitigates cyber threats."[78]

130. AT&T recognizes the risks that arise when a cell phone is compromised, stating, "Our phones are mini-computers, and with so much personal data on our phones today, it's also important to secure our mobile devices."[79] AT&T's

---

[75] *Id.* (emphasis added).
[76] Brian Rexroad, "Secure Your Number to Reduce SIM Swap Scams," AT&T's Cyber Aware (Sep. 2017), https://about.att.com/pages/cyberaware/ni/blog/sim_swap.
[77] "AT&T Tech Channel," YouTube, https://www.youtube.com/user/ATTTechChannel.
[78] "AT&T – Protect Your Network with the Power of &," VIMEO, https://vimeo.com/172399153.
[79] AT&T, "Mobile Security," YOUTUBE (Feb. 12, 2019),

advertisements also stress how central a role cell phones play in its customer's lives, stating: "My phone is my life" and "My phone is everything." The same ad stresses how the inability to use a cell phone makes people feel "completely untethered, flailing around."[80]

131. AT&T markets its ability to identify to and neutralize emerging cyber threats for its customers. In one video, AT&T employees discuss "threat hunting" which they describe as "an active threat analysis where you're actually thinking about your adversary."[81] They claim that it's "important" and "something [AT&T has] been doing for a long time."[82] They advise that companies should think about "what would a hacker want to do, where would a hacker go to get my data, what are some of the points on my network that are most vulnerable, or where is the data flow that is potentially going to be a leakage" and state that "having threat hunting as part of a proactive continuous program, integrating with existing security measures, will help [you] stay ahead of the threats."[83]

132. Not only did AT&T advise staying ahead of and addressing cyber threats, it also stressed that these practices could even help identify "insider threats"— employees within the company.

133. In an additional video focused on insider threats, AT&T employees, representatives and agents go on at length about the threat of company insiders selling corporate information and access, citing a survey showing that "30% [of respondents] had purposefully sent data outside of their organization at some point in time" and "14% of the people that were interviewed said they would actually sell their corporate log-ins to folks on the outside or sell that data for less than about $250 US."[84] They

---

https://www.youtube.com/watch?v=KSPHS89VnX0.
[80] "AT&T Mobile Movement Campaign – Ads," VIMEO, https://vimeo.com/224936108.
[81] AT&T Tech Channel, "The Huntin' and Phishin' Episode," YOUTUBE (Apr. 21, 2017), https://www.youtube.com/watch?v=3g9cPCiFosk.
[82] *Id.*
[83] *Id.*
[84] AT&T ThreatTraq, "The Real Threat of Insider Threats," YouTube (May 5, 2017), https://www.youtube.com/watch?v=ZM5tuNiVsjs (emphasis added).

THIRD AMENDED COMPLAINT

cited as a "significant concern" the "individuals that have privileged access, that have broad access inside an organization."[85] AT&T therefore knew or should have known that there was a significant risk that its own employees, representatives and agents would sell AT&T data— including customer account data—and that the risk was heightened when employees had too broad of an access to corporate systems, yet AT&T failed to put sufficient systems and resources in place to mitigate that risk, despite its own advice to the contrary.

134. AT&T has also recognized the danger presented to its customers when their email addresses are hacked, as Mr. Shapiro's was on multiple occasions as a result of AT&T's failures. As one AT&T employee puts it: "I think most people do have something valuable [in their email accounts], which is access to all their other accounts, which you can get with a password reset."[86] They call this "something worth keeping safe."[87] They advised that a "strong, obviously, security awareness program within a company . . . is extremely important."[88]

135. In this video series, AT&T makes specific mentions of SIM swapping activity. In one video, AT&T's Vice President of Security Platforms (Brian Rexroad) and Principal of Technology Security (Matt Keyser) discuss the hack of a forum



[85] *Id.*
[86] *Id.*
[87] *Id.*
[88] *Id.*

THIRD AMENDED COMPLAINT

called OGusers.[89] In the segment, they discuss the hacking of social media users' account names and point to a news story that highlights—in distinct orange type—that OGusers is a forum popular among people "conducting SIM swapping attacks to seize control over victims' phone numbers."[90]

136. AT&T was therefore well aware of the significant risk that AT&T employees, representatives and agents and SIM swapping presented to its customers, and the need to mitigate such risks, but nonetheless failed to take adequate steps to protect Mr. Shapiro. Instead, it continued to make public statements giving rise to a reasonable expectation that AT&T could—and would—protect its customers.

137. Additionally, Mr. Shapiro's hack was foreseeable because at least two of the AT&T employees, representatives and agents involved—Jack and White—were involved in a suspiciously high number of unauthorized SIM swaps the very same month of Mr. Shapiro's first and second hacks. White conducted *29 unauthorized SIM swaps in May 2018,* while Jack conducted *12 unauthorized swaps* that same month. This suspicious activity should have raised alarms at AT&T, but the company nonetheless failed to protect Mr. Shapiro from these employees, representatives and agents.

138. The risk to Mr. Shapiro's account, specifically, was particularly foreseeable after the very first breach on May 16, 2018. Despite confirming that a breach had occurred, AT&T employees, representatives and agents refused to help Mr. Shapiro when his account was again breached and his SIM card swapped just a few minutes after he restored control over his account on May 16. Instead, AT&T did nothing while its employees, representatives and agents aided hackers in their more than $1.9 million theft from Mr. Shapiro, valued much higher today because of the increase in

---

[89] AT&T ThreatTraq, "5/31/19 Account-hacking Forum OGusers Hacked," YOUTUBE (May 31 2019), https://www.youtube.com/watch?time_continue=234&v=cS4xV3cej3A.

[90] *Id.*; *see also* Freeman Indictment at ¶ 2 (Describing how "discussions—such as discussing the manner and means to [SIM swap] attacks generally, and networking among [SIM swap hackers]—typically took place on forums such as "OGusers.").

1  cryptocurrency values.

2  139. Even after two documented account breaches and unauthorized SIM swaps in
3  May, AT&T failed to protect Mr. Shapiro's account on two additional occasions in
4  November 2018 and May 2019.

5  140. That Mr. Shapiro was at risk of account breaches at the hands of AT&T
6  employees, representatives and agents is particularly foreseeable—and AT&T's
7  failures are particularly stark—in light of AT&T's history of unauthorized employees,
8  representatives and agents access to customer accounts.

9  141. In 2015, AT&T faced an FCC enforcement action, and paid a $25 million
10  civil penalty, for nearly identical failures to protect its customers' sensitive account
11  data.[91] In that case, as AT&T admitted, employees, representatives and agents at an
12  AT&T call center breached 280,000 customers' accounts.[92] Specifically, AT&T
13  employees, representatives and agents had improperly used login credentials to access
14  customer accounts and access customer information that could be used to unlock the
15  customers' devices.[93] The employees, representatives and agents then sold the
16  information they obtained from the breaches to a third party.[94]

17  142. The FCC concluded that AT&T's "failure to reasonably secure customers'
18  proprietary information violates a carrier's statutory duty under the Communications
19  Act to protect that information, and also constitutes an unjust and unreasonable
20  practice in violation of the Act."[95]

21  143. The FCC stressed that the FCA is intended to "ensure that consumers can
22  trust that carriers have taken appropriate steps to ensure that unauthorized persons are
23  not accessing, viewing or misusing their personal information."[96] It stressed its
24  expectation that "telecommunications carriers such as AT&T . . . take 'every

25  _____
[91] *In the Matter of AT&T Servs., Inc.*, 30 F.C.C. Rcd. 2808 (2015).
26  [92] *Id.* ¶ 1.
[93] *Id.* ¶¶ 7, 11.
27  [94] *Id.* ¶ 1.
[95] *Id.* ¶ 2.
28  [96] *Id.*

reasonable precaution' to protect their customers' data[.]"[97]

144. As part of its penalty, AT&T entered into a stipulated Consent Decree with the FCC, in which AT&T agreed to develop and implement a compliance plan to ensure appropriate safeguards to protect consumers against similar breaches by improving its privacy and data security practices.[98]

145. This FCC enforcement action underscores AT&T's knowledge of the risk its employees presented to customers, the prevalence of employee breaches to customer data, the sensitive nature of customer CPNI, and its duties to protect and safeguard that data.

146. Nonetheless, more than 3 years after stipulating to the Consent Decree, AT&T still failed to protect its customer from employee, representative and agent breaches of customer CPNI and other account data, virtually identical to the breach at issue here, heightening the degree of its negligence.

147. In January 2020, Princeton researchers released a study finding that top U.S. mobile carriers, including AT&T, do little to protect customers from SIM swap fraud.[99] The study stated "We examined the authentication procedures used by five prepaid wireless carriers when a customer attempted to change their SIM card. ***We found that all five carriers used insecure authentication challenges that could be easily subverted by attackers***. We also found that attackers generally only needed to target the most vulnerable authentication challenges, because the rest could be bypassed." The researchers pretended to be the true phone owner and said they forgot answers to security questions study stating, "Our key finding is that, at the time of our data collection, all 5 carriers used insecure authentication challenges that could easily be subverted by attackers." The study also found: (i) Callers only needed to successfully respond to one challenge in order to authenticate, even if they had failed

[97] *Id.*

[98] *Id.* ¶¶ 2, 17-18, 21.

[99] *"An Empirical Study of Wireless Carrier Authentication for SIM Swaps"* Kevin Lee, Ben Kaiser, Jonathan Mayer, Arvind Narayanan Dept of Computer Science and Center for Information Technology Policy, Princeton University, January 10, 2020 at https://www.issms2fasecure.com/assets/sim_swaps-01-10-2020.pdf

numerous prior challenges. (ii) Four-fifths of SIM-swap fraud attempts were successful, and the researchers attempted 50 SIM swaps and successfully completed 39. (iii) AT&T, Verizon and T-Mobile failed the study. (iv) Some carriers even guided them to the correct answer or didn't ask for anything at all. The Princeton study was widely reported in the media and prompted Congress to get involved.  In January 2020, Senator Ron Wyden and 5 other Senators and Congressmen published a letter to FCC Chairman Ajit Pai calling on him to take action to protect consumers against SIM swap fraud, with the Senator stating "SIM swap fraud may also endanger national security. For example, if a cybercriminal or foreign government uses a SIM swap to hack into the email account of a local public safety official, they could then leverage that access to issue emergency alerts using the federal alert and warning system operated by the Federal Emergency Management Agency."[100] Senator Wyden also stated, "Consumers are at the mercy of wireless carriers when it comes to being protected against SIM swaps."[101]

148. According to a Wall Street Journal ("WSJ") article from November 2019, "He Thought His Phone Was Secure; Then He Lost $24 Million to Hackers," investigators say they know of more than 3,000 SIM swap victims, accounting for at least $70 million in theft nationwide (the real numbers are likely much higher considering that many cases go unreported).[102] The WSJ article states, "the people who investigate these attacks consider them some of the most harmful they have ever seen." [102] Victims include high profile public officials, celebrities, and business executives like Jack Dorsey, the CEO of Twitter, whose 2019 SIM swap hack was profiled in the Forbes article "Why Twitter Blames AT&T For The Hack Of Its CEO Jack Dorsey Account, Sending Shocking Racist Tweets," and quotes Jeb Su, a Principal Analyst at Atherton Research as saying "*AT&T's poor security policy made this malicious [SIM*

---

[100] https://docs.fcc.gov/public/attachments/DOC-362599A1.pdf
[101] https://twitter.com/ronwyden/status/1215757690875600896
[102] https://www.wsj.com/articles/he-thought-his-phone-was-secure-then-he-lost-24-million-to-hackers-11573221600.

*swap] hack possible.*" [103]  The same hacker who executed Jack Dorsey's SIM swap also successfully hacked the District Attorney prosecuting the hacker of another AT&T customer.[104]

149. The SIM swap problem is exacerbated by AT&T's sprawling, mismanaged and problematic call center system. In 2017, AT&T's parent (AT&T, Inc.) had 254,000 employees[105] and 38 third-party call centers across eight non-US countries.[106] A study by the Communication Workers of America ("CWA") entitled "AT&T 2018 Jobs Report: Telecom Giant Hollows Out Middle Class Workforce and Outsources to Global Contractors, Even as it Reaps Tax Windfall" details how AT&T's call center operation is fundamentally broken.  Among the key findings were that (i)  employees at AT&T vendor call centers face inadequate training and intense pressure to reach unrealistic quotas  – making it difficult to meet customer's needs; (ii) overseas vendors, paid as little as $1.60 per hour and often rely on other members of their household to make ends meet, provide inaccurate information, fail to solve problems, offer credits or promotions that cannot be honored, and enroll customers in services they did not request; and (iii)  the problems caused by overseas operations add to the burden of U.S. based workers, thereby affecting their work. On information and belief, all of AT&T's numerous customer service representatives are authorized to perform SIM swaps, exacerbating the problem.  In  order to address its organizational failings, AT&T could have created a call center dedicated to SIM swaps, and properly vetted, trained and supervised SIM swap customer service representatives, in order to address the problem of unauthorized SIM swaps.

---

[103] https://www.forbes.com/sites/jeanbaptiste/2019/08/31/why-twitter-blames-att-for-ceo-jack-dorsey-account-hack-sending-shocking-racist-tweets/.

[104] *"Authorities Arrest Alleged Member of Group That Hacked Jack Dorsey*", Vice by Joseph Cox, November 23, 2019 at https://www.vice.com/en_us/article/gyzawx/authorities-arrest-suspected-jack-dorsey-hacker.

[105] https://www.statista.com/statistics/220683/number-of-atundt-employees-since-2007/

[106] New Report Pulls Back the Curtain on AT&T's Vast Network of Offshored Call Centers at https://cwa-union.org/news/releases/new-report-pulls-back-curtain-on-atts-vast-network-of-offshored-call-centers

THIRD AMENDED COMPLAINT

150. More significantly, for many years AT&T has been fully aware of well-established technology solutions, which it could have configured its systems to require, to deter and prevent unauthorized SIM swaps and resulting thefts, which it could easily have implemented well *before* Mr. Shapiro's phone was SIM swapped, but failed and refused to implement:

a.   *Location detection*.  At the exact moment of the SIM swap request, AT&T knew the hacker's location (which Shapiro is informed was in Florida), and that Mr. Shapiro's phone was simultaneously in Manhattan, as AT&T tracks customers' location and even sells their location data.[107]  AT&T knew that Mr. Shapiro and his phone could not simultaneously be in the same place, and could have easily recognized the SIM swap request as a fraud attempt, denied it, and alerted Mr. Shapiro.  AT&T was actually profiting off customers' location data at the same time as it did nothing to use the same location data to prevent the unauthorized SIM swap.

b.   *Text message*.  AT&T could have simply sent Mr. Shapiro a text message asking him to confirm whether he requested the SIM swap. He would have replied "no" and AT&T would have then denied the hacker's SIM swap request and could have reported the fraud attempt to Mr. Shapiro. AT&T regularly sends text messages to its customers for marketing purposes, and asks customers to reply if they want to stop receiving such texts.

c.   *Email confirmation.* AT&T could have simply sent Mr. Shapiro an email asking him to confirm whether he requested the SIM swap. AT&T could have asked for a confirmation directly within the email or directed him to a legitimate link to confirm the request. Mr. Shapiro would have replied "no" and AT&T would have then denied the hacker's SIM swap request and could have reported the fraud attempt to Mr. Shapiro.

d.   *Voice biometrics*.  Voicebiometrics (or "Voice Id") is a well-

---

[107] FCC Proposes Over $200 Million in Fines Against Four Largest Wireless Carriers For Apparently Failing to Adequately Protect Consumer Location Data February 28, 2020 at https://docs.fcc.gov/public/attachments/DOC-362754A1.pdf

established and cost-effective technology that has been implemented by leading financial institutions (e.g., Chase, Wells Fargo and Schwab) to prevent fraud by verifying customers' identities by comparing a caller's voice to a customer (or fraudster) voiceprint stored on file.[108]  The technology has also been implemented by in Europe, including by the largest carrier in Europe, Deutsche Telekom.[109]  While AT&T developed its own voice biometrics solution called AT&T Watson, the technology was never implemented to prevent SIM swaps, and instead was sold to Interactions Corporation ("Interactions") in 2014 in exchange for an equity stake.[110] Ironically, Interactions continues to promote its voice biometrics solution as "Secure and Convenient Authentication,"[111]  continues to publicly promote the solution to its large corporate customers who have their own call centers (e.g., banks, insurance companies), a publishing a research report entitled "4 emerging technologies that could transform your contact center," which provides in relevant part as follows: Even as companies take steps to guard their IT environments against a growing barrage of cyberthreats, many are neglecting another vulnerable area: their contact centers.

> Social engineering calls to contact centers — in which fraudsters pose as customers and try to trick agents into revealing confidential customer information — are on the rise, according to industry experts, particularly at financial institutions, insurance companies and other businesses that store sensitive data.
>
> Voice biometrics can help your agents know exactly with whom they're talking when they answer a customer call.

[108] Chase at https://www.chase.com/personal/voice-biometrics, Wells Fargo at https://www.wellsfargo.com/privacy-security/voice-verification, and Schwab at https://www.schwab.com/voice-id.
[109] *Deutsche Telekom turns to biometrics for authentication and fraud detection* https://telecoms.com/491915/dt-turns-to-biometrics-for-authentication-and-fraud-detection/
[110] *AT&T and Interactions Agree to Strategic Transaction in Speech and Multi-Modal Technology Arena* November 5, 2014. https://about.att.com/story/att_and_interactions_agree_to_strategic_transaction_in_speech_and_multi_modal_technology_arena.html
[111] https://www.interactions.com/products/voice-biometrics/

This technology can recognize voice characteristics passively and verify callers in real time, whether they need to speak to one of your representatives or are using your interactive voice response system.

"By comparing your callers' voiceprints against a database of known fraudster voiceprints, voice biometrics programs can help you identify and track potential thieves before they steal your data."[112]

e.    *Data sharing*.   Mobile phone carriers in other countries have implemented a "data sharing" solution to prevent theft once an unauthorized SIM swap has occurred.  In essence, the carriers allow financial institutions real-time access to their SIM swap data so that the institution can block a requested currency transfer if there has been a SIM swap within a specified time frame (e.g., within 48 hours of the transfer request), since very recent SIM swap combined with a withdrawal request is a strong indicator of fraud.  The data sharing solution is widely known and broadly used by major carriers outside of the US.  Wired magazine published an article entitled "The SIM Swap Fix That the US isn't Using," which states in relevant part that "While foreign phone carriers are sharing data to stop SIM swap fraud, US carriers are dragging feet."[113] Wired describes that even carriers in developing countries such as Mozambique implemented the solution within a few months of understanding the extent of the problem, and that the Head of IT, Cyber Security & Core Data Networks at Vodacom reported that "[the solution] reduced their SIM swap fraud to nearly zero overnight".[114] Third party aggregators such as Prove.com (formerly Payfone, Inc.) and Telesign Corporation, who license SIM swap

---

[112] "*4 Emerging Technologies That Could Transform Your Contact Center" Mike Rajich, AT&T Director of Contact Center and Enterprise Routing Product Management, AT&T* https://www.business.att.com/learn/research-reports/4-emerging-technologies-that-could-transform-your-contact-center.html
[113] *The SIM Swap Fix That the US Isn't Using, Wired*, Andy Greenberg, April 26, 2019 https://www.wired.com/story/sim-swap-fix-carriers-banks/.
[114] Id.

THIRD AMENDED COMPLAINT

data from non-US carriers and sell it as a fraud prevention offering to banks. Figure 4 shows how all four major carriers in the United Kingdom ("UK"), including British Telecom, Vodafone, O2 and Three, provide their SIM swap data to Prove.com, which in turn sells a fraud prevention service to banks enabling them to do real-time SIM swap checks to at the time of customers' high-risk transactions.[115]

       f.    *Dedicated SIM swap centers*. On information and belief, AT&T permits remote SIM swaps at each of its numerous call centers located throughout the world which results in failing to conduct proper hiring, training, supervision, and oversight, instead of creating a single center where a dedicated team of properly vetted, trained and supervised call center workers handle the remote SIM swap.

151. Had AT&T implemented any of the foregoing low cost and easy to implement solutions, Mr. Shapiro would not have been the victim of an unauthorized SIM swap.

152. Instead of implementing solutions to **prevent** unauthorized SIM swaps, AT&T appears to have made the conscious business decision to profit from unauthorized SIM swaps **after** they have occurred. On September 18, 2018, AT&T, Verizon and T Mobile publicly announced the joint business scheme they had been developing for months called "Project Verify," now known as ZenKey, to profit from the SIM swap problem.[116]

153. ZenKey is marketed to consumers as an easier and more secure way to log into other online services, stating "Your carrier has a unique ability to identify and protect your mobile identity" and that ZenKey checks for suspicious activity at the carrier, denoting a real-time SIM swap check (as this is the most significant suspicious activity that can occur in a customer's mobile account).[117] AT&T/ZenKey promotes that it "has a unique ability to identify and protect your mobile identity" and checks

---

[115] https://info.prove.com/psd2-sca-uk-mobile-authentication
[116] *U.S. Mobile Giants Want to be Your Online Identity* at  https://krebsonsecurity.com/tag/project-verify/

[117] https://myzenkey.com/how-it-works/

for suspicious activity. AT&T's ZenKey consumer app is available to consumers currently in the Apple and Google  app stores for iPhone and Android devices, as shown in Figure 6.[118] At the same time, ZenKey is marketed to financial institutions as an identity and authentication scheme through its "Trust Services" offering, to prevent fraud, with the clear representation that its purpose is to combat SIM swap fraud:

"**SIM Swap Fraud has already cost businesses hundreds of millions of dollars and the threat is increasing**. **With ZenKey, fraudsters can no longer access your users' accounts based on stolen credentials and a simple SIM Swap**."[119]  ZenKey's benefits page states "**SIM swap fraud is on the rise and has cost businesses hundreds of millions of dollars ZenKey offers a suite of APIs and event alerts (Trust Services) for Service Providers to receive on-demand fraud signals and automatic indicators**."[120] The ZenKey Trust Services proposal, as shown in Figure 7 is effectively executing the same type of real-time SIM swap database check as the data sharing method as described above.  ZenKey seeks to charge fees to financial institutions in exchange for doing real-time checks against carrier databases to verify when a SIM swap (authorized or not) was last done,[121] and its Portal Agreement Terms of Service provides that "Certain services accessed or available through the [ZenKey] Portal, especially services for which You [e.g. a bank] are asked to subscribe or pay money, may have their own terms and conditions, including but not limited to the Service Agreement."[122] **ZenKey has failed to date in the marketplace, and has not yet been adopted by financial institutions.**

154. By not implementing even basic solutions to mitigate, let alone substantially reduce SIM swap fraud, AT&T maintains a larger revenue opportunity for ZenKey, as more unauthorized SIM swaps lead to more fraud at banks, which result in a greater

---

[118] iPhone app at https://apps.apple.com/us/app/zenkey-powered-by-at-t/id1490293601, Android app at https://play.google.com/store/apps/details?id=com.att.cso.consumer.MKapp&hl=en_US
[119]  https://myzenkey.com/trust-services/

[120] https://myzenkey.com/business-benefits/
[121] ZenKey website at https://myzenkey.com/trust-services/
[122] https://portal.myzenkey.com/terms

THIRD AMENDED COMPLAINT

need for banks to pay for and check SIM swap data in real-time.  While ZenKey has failed to date in the marketplace, and has not yet been adopted by financial institutions, AT&T and its Zenkey partner-competitors continue to invest in it (to date, they have invested around $200 million), promote it and develop it, rather than implement simple solutions to broadly prevent unauthorized SIM swaps. Rather than having easily and expeditiously implemented a data sharing solution in which AT&T licensed their SIM swap database to third party aggregators (such as Prove.com[123] or TeleSign Corporation[124]) or directly to financial institutions (such as Coinbase or Gemini), to enable them to do real-time database checks at the time of a high-risk transactions (as non-US carriers do[113]), AT&T focused its efforts developing ZenKey in collusion with Verizon and T-Mobile in their ill-conceived (and to-date failed) attempt to more directly profit and control the authentication market opportunity.

**F.    Defendants Are Liable for the Acts of Their Employees, Representatives and Agents**

155. More than 3 years after stipulating to the Consent Decree, AT&T still failed to protect its customer from employee, representative and agent breaches of customer CPNI and other account data, virtually identical to the breaches at issue here, heightening the degree of its negligence.

156. Mr. Shapiro, unlike AT&T, was not in a position to adequately protect himself from the harms arising from the SIM swap attacks. AT&T, Mr. Shapiro's wireless provider, was responsible for safeguarding his account and its involvement was required for any change in SIM to be effective. Because SIM change requests were all routed through AT&T, and not through Mr. Shapiro directly, AT&T alone was positioned to prevent unauthorized SIM changes. It is unreasonable to expect Mr.

---

[123] *The End of Dangerous SIM Swap Fraud is Here: Payfone Extends Real-Time SIM Swap Detection Algorithms* at https://www.payfone.com/press/the-end-of-dangerous-sim-swap-fraud-is-here/
[124] How TeleSign Protects Transactions from SIM Swap Fraud at https://www.telesign.com/blog/how-telesign-protects-transactions-from-sim-swap-fraud

Shapiro to be able to fully protect his account when AT&T, the responsible entity, failed to do so.

157. Additionally, Mr. Shapiro took all of the steps that AT&T advised he take in order to protect his account—including purchasing a new SIM card and mobile phone and changing his account passcode—and was repeatedly told by AT&T that such steps would protect his account from further breaches and SIM swaps. Mr. Shapiro reasonably relied on these representations.

**i. Defendants Are Liable for the Acts of its Employees, Representatives and Agents**.

158. Defendants are liable for the acts of their employees and agents, including Jack and White, who facilitated the unauthorized access to, and resulting theft from, Mr. Shapiro.

159. Defendants failed to put in place adequate systems and procedures to prevent the unauthorized employee, representatives and agents access to and sale of Mr. Shapiro's account and related data. AT&T failed to properly hire and supervise its employees and agents, allowing them to access Mr. Shapiro's sensitive and confidential account data, and sell access to his account and that data to third parties.

160. In the context of AT&T's enterprise as a telecommunications carrier, an employee, representatives and agents accessing a customer's account information and effectuating a SIM swap—even without authorization—is not so unusual or startling that it would not be unfair to include the loss resulting from such unauthorized access among other costs of AT&T's business – particularly in light of AT&T's awareness of the risk of SIM swaps to its customers.

161. Further, imposing liability on Defendants may prevent recurrence of SIM swap behavior because it creates a strong incentive for vigilance and proper safeguarding of customers' data by Defendants, particularly AT&T, which is in the best position to guard substantially against this activity, as it is the custodian and guardian of this data.

162. As a customer of AT&T, Mr. Shapiro is entitled to rely upon the presumption that AT&T and the agents entrusted with the performance of AT&T's business have faithfully and honestly discharged the duty owed to him by AT&T, and that they would not knowingly gain unauthorized access to his account in order to aid in perpetuating a theft from him.

163. The reasonableness of Mr. Shapiro's expectations that AT&T would safeguard his data is confirmed by the fact that the federal agency responsible for overseeing AT&T's duties to its customers, the FCC, has stated that it "fully expect[s] carriers to take every reasonable precaution to protect the confidentiality of proprietary or personal customer information."[125]

**V. AT&T's Misrepresentations and Omissions.**

164. AT&T's Privacy Policy, and the "Privacy Commitments" included therein, falsely represents and fails to disclose material information about its data security practices.

165. Mr. Shapiro relied on AT&T's Privacy Policy and related commitments when he chose to open his account with AT&T in approximately 2006.

166. Privacy was important to Mr. Shapiro. Prior to opening his AT&T account, Mr. Shapiro was employed as the Director of Interactive Production for DIRECTV, a direct broadcast satellite service provider later acquired by AT&T. In that role, Mr. Shapiro was directly involved in analyzing privacy policies and consumer data protections for DIRECTV and other technology and media corporations involved in doing business with DIRECTV, including Microsoft, TiVo, and others.

167. On information and belief, AT&T's 2006 Privacy Policy was the operative policy at the time Mr. Shapiro opened his AT&T account or was substantially similar to the operative policy upon which he relied at that time. In its 2006 Privacy Policy, AT&T promised to protect Mr. Shapiro's privacy and personal information, including by using security safeguards. AT&T further pledges that it will not sell customer data.

[125] 2007 CPNI Order ¶ 64.

168. These representations created an expectation that Mr. Shapiro's AT&T account and associated data would be safe and secure, that employees and agents would not access his account without authorization or sell access to his account, that his data would be protected from unauthorized disclosure, and that he could control how and when his data was accessed.

169. AT&T's representation that it uses encryption methods and other security measures and safeguards to protect customer data is false and misleading.

170. As alleged fully above, AT&T allowed its employees and agents to access Mr. Shapiro's account, and the CPNI and other sensitive data contained therein, without his authorization. AT&T's statement that it would use encryption and other security measures to protect customers' data and "protect against unauthorized access to . . . data, including personal identifying information" is therefore a material misrepresentation.

171. Upon information and belief, AT&T's security safeguards were inadequate, including its system which—upon information and belief—allowed an individual employee, representative and agent to conduct SIM swaps without adequate oversight, even when that employee, representative and agent conducted a large number of unauthorized SIM swaps in a short period of time (as demonstrated in the cases of White and Jack). This is despite AT&T's promise to "limit access to personal identifying information to those employees and agents . . . who need access to such information to operate, develop, or improve [AT&T's] services and products."

172. "Having one employee who can conduct these SIM swaps without any kind of oversight seems to be the real problem," says Lieutenant John Rose, a member of the California-based Regional Enforcement Allied Computer Team ("REACT"), a multi-jurisdictional law enforcement partnership specializing in cybercrime.[126] "And it seems like [the carriers] could really put a stop to it if there were more checks and

---

[126] "Busting SIM Swappers and SIM Swap Myths," KREBSONSECURITY (Nov. 18, 2018), https://krebsonsecurity.com/2018/11/busting-sim-swappers-and-sim-swap-myths.

balances to prevent that. It's still very, very easy to SIM swap, and something has to be done because it's just too simple. Someone needs to light a fire under some folks to get these protections put in place."[127]

173.  AT&T failed to put in place adequate systems and procedures to prevent the unauthorized employee access to and sale of Mr. Shapiro's account and related data. In connection with subsequent criminal investigations into Mr. Shapiro's SIM swaps, AT&T informed law enforcement that it had the capacity to see how many different SIM cards had been associated with the same single cell phone's IMEI. In other words, AT&T could see when one cell phone had multiple SIM cards associated with it in a short amount of time.[128]

174.  AT&T also informed law enforcement that the hacker involved in Mr. Shapiro's SIM swap had requested that 40 different AT&T wireless accounts be moved onto his phone (identified by its IMEI number) in the months leading up to Mr. Shapiro's swap.[129] AT&T therefore had the technology to track how many different accounts were being much on to the same telephone, as demonstrated by its ability to pull this information for law enforcement. Despite its ability to track this highly suspicious behavior, AT&T failed to use this technology to protect Mr. Shapiro's account. If AT&T had proper security safeguards in place, it would have recognized this behavior, flagged it as suspicious, and prevented any further SIM swaps onto that phone – thereby protecting Mr. Shapiro.

175.  AT&T provided information to law enforcement about how AT&T SIM swap victims' AT&T accounts were used while under the control of hackers. This information clearly showed that hackers were using the AT&T wireless accounts to attempt to access other personal accounts. AT&T informed law enforcement that,

---

[127] REACT investigative report, (attached hereto as Exhibit I), describes how certain SIM swap attacks occurred, and includes statements from victims, including Mr. Shapiro, at p. 11-12.
[128] *See* Probation Report, *California v. Joel Ortiz*, No. C-189481 (CA Sup. Ct. Mar. 14, 2019) at p. 7 (attached hereto as Exhibit H.)
[129] *Id.* at 7.

THIRD AMENDED COMPLAINT

"During the time the [hacker] controlled several of the [SIM swap] victims' cell telephones, all telephones received multiple text messages while no text messages were sent."[130]This was suspicious because it indicated that hackers were receiving password-reset or two-factor authentication text messages in an attempt to access victims' other online accounts, rather than using the AT&T accounts for normal, legitimate purposes. As described by law enforcement:

> Based on the volume of text messages the [hacker] received, the short time he controlled the [AT&T user] victims' accounts, as well as the majority of text messages originating from short code numbers,[131] [law enforcement] officers deduced [that] once [the hacker] gained control of a victim's cell phone account, the [hacker] attempted to log into their other accounts. Police believed the defendant was able to do this either by receiving a 2FA [two-factor authentication] text message from individual websites sent via text message to the AT&T account controlled by the [hacker], or the specific website text a code allowing the [hacker] to reset the passwords on-line.[132]

176. Therefore, AT&T had the capability to see this behavior and should have flagged it as suspicious. If AT&T had proper security safeguards in place, it would have recognized this behavior, flagged it as suspicious, and prevented any further SIM swaps onto that phone – thereby protecting Mr. Shapiro.

177. Additionally, as alleged fully above, AT&T failed to establish a consent mechanism that verified proper authorization before Mr. Shapiro's data was accessed and provided to third parties. AT&T's statement that it would use encryption and other security safeguards to protect customers' data is therefore a material misrepresentation.

178. AT&T's representation that it will "protect the privacy of [its] customers and safeguard the privacy of [their] personal identifying information" is false and misleading.

---

[130] *Id.*

[131]As described by law enforcement, a "short code number" is "a phone number used strictly to send text message and cannot receive voice calls." Short code numbers are used by businesses to send users password-reset links or passcodes.

[132] Ex. H at 9.

179. If Mr. Shapiro had known before contracting with AT&T in approximately 2006 that AT&T's Privacy Policy was false and misleading and that it would not secure his CPNI, then Mr. Shapiro would have behaved differently— including, but not limited to, taking additional security measures and precautions such as not linking applications to his AT&T mobile phone, storing his email accounts on a separate digital device, or considering another mobile carrier.

180. As alleged fully above, AT&T failed to establish a consent mechanism that verified proper authorization before Mr. Shapiro's account and the data therein was used without his authorization or consent and disclosed to third parties. Mr. Shapiro's privacy and personal information was not safe, as demonstrated by the repeated breaches of his AT&T account. AT&T's statement that it would protect customers' privacy and keep their personal information safe is therefore a material misrepresentation.

181. AT&T's representation that it will not sell customers' personal information or CPNI is false and misleading.

182. As alleged fully above, AT&T employees and agents sold access to Mr. Shapiro's AT&T account to third parties. AT&T's statement that it would not sell customers' personal information is therefore a material misrepresentation.

183. AT&T also makes numerous false or misleading representations concerning its treatment of customers' data that qualifies as CPNI under the FCA.

184. AT&T explicitly and falsely represents in its Privacy Policy that it does not "sell, trade or share" customers' CPNI:

> We do not sell, trade or share your CPNI – including your calling records - with anyone outside of the AT&T family of companies or with anyone not authorized to represent us to offer our products or services, or to perform functions on our behalf except as may be required by law or authorized by you.[133]

---

[133] 2006 Privacy Policy. "In this policy, the AT&T family of companies means AT&T Inc. and its subsidiary and affiliated entities." "Customer Proprietary Network Information (CPNI)," Ex. A. On

185. As alleged fully above, AT&T provided access to Mr. Shapiro's CPNI to third-party hackers. This use was not required by law and was instead prohibited by law.

186. AT&T also states that it only uses CPNI internally and its only disclosed use of CPNI is among the AT&T companies and its agents in order to offer its products or services.[134]

187. AT&T employees and agents' sale of access to Mr. Shapiro's account and related data as described herein was not for internal AT&T purposes, nor was it used to market AT&T services. AT&T's statements regarding the sale and/or use of customer CPNI are therefore material misrepresentations. Its failure to disclose this sale of access to CPNI is a material omission.

188. AT&T also falsely represents that it "implement[s] technology and security features, and strict policy guidelines to safeguard the privacy of [customers'] personal identifying information," and that it "will continue to enhance security procedures as new technology becomes available."

189. As alleged fully above, AT&T and its agents failed to safeguard Mr. Shapiro's CPNI. Instead, it stored customer CPNI in such a way that unauthorized access was easily obtained by employees and agents and third parties. AT&T's statements regarding the technology and security features it uses to safeguard customer CPNI are therefore material misrepresentations.

190. After each breach of his account and unauthorized SIM swap, AT&T repeatedly, and falsely, represented to Mr. Shapiro that his account was safe from future breaches. In reliance upon these statements, Mr. Shapiro maintained his AT&T account. AT&T also repeatedly told Mr. Shapiro that the notations made on his account and the passcode needed to change his SIM card would protect him from

---

information and belief, AT&T included similar protections in all subsequent privacy policies during the duration of Mr. Shapiro's account.
[134] *Id.*

future breaches and SIM swaps. These misrepresentations were false and materially misleading, as demonstrated by the ongoing breaches to Mr. Shapiro's account.

191. AT&T was obligated to disclose the weaknesses and failures of its account and data security practices, as AT&T had exclusive knowledge of material facts not known or knowable to its customers, AT&T actively concealed these material facts from Mr. Shapiro, and such disclosures were necessary to materially qualify its representations that it did not sell and took measures to protect consumer data and to materially qualify its partial disclosures concerning its use of customers' CPNI. Further, AT&T was obligated to disclose its practices under the FCA.

192. A reasonable person would be deceived and misled by AT&T's misrepresentations, which clearly indicated that AT&T would not sell, and would in fact safeguard, its customers' personal information and CPNI.

193. AT&T intentionally misled Mr. Shapiro regarding its data security practices in order to maintain his business and evade prosecution for its unlawful acts.

194. AT&T's representations that it protected customers' personal information, when in fact it did not, were false, deceptive, and misleading and therefore a violation of the FCA.

195. On August 9, 2019, Mr. Shapiro sent written notice via certified mail to AT&T of his intent to file an action for damages for the claims that follow based the allegations described herein.

**VI. CLAIMS FOR RELIEF**

<div align="center">

**COUNT I**

**Violations of The Federal Communications Act, 47 U.S.C. § 201 et seq.**

**(Against all Defendants)**

</div>

196. Plaintiff Mr. Shapiro realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

197. Defendants have violated 47 U.S.C. § 222(a) by failing to protect the confidentiality of Mr. Shapiro's CPNI, as detailed herein.

198. Defendants have violated 47 U.S.C. § 222(c) by using, disclosing, and/or permitting access to Mr. Shapiro's CPNI without the notice, consent, and/or legal authorization required under the FCA, as detailed herein. Defendants also caused and/or permitted third parties to use, disclose, and/or permit access to Mr. Shapiro's CPNI without the notice, consent, and/or legal authorization required under the FCA, as detailed herein.

199. As fully alleged above, Mr. Shapiro has suffered injury to his person, property, health, and reputation as a consequence of Defendants' violations of the FCA. Additionally, Mr. Shapiro has suffered emotional damages, including severe anxiety and depression, mental anguish, and suffering as a result of Defendants' acts and practices.

200. Mr. Shapiro seeks the full amount of damages sustained as a consequence of Defendants' violations of the FCA, together with reasonable attorneys' fees, to be fixed by the Court and taxed and collected as part of the costs of the case. Mr. Shapiro also moves for a writ of injunction or other proper process, mandatory or otherwise, to restrain Defendants and their officers, agents, or representatives from further disobedience of the 2007 and 2013 CPNI Orders, or to compel their obedience to the same.

## COUNT II

**Violations of The California Unfair Competition Law ("UCL") under the Unlawful, Unfair and Fraudulent Prongs,**

**California Business & Professional Code § 17200 et seq.**

**(Against AT&T)**

201. Plaintiff Mr. Shapiro realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

202. California's Unfair Competition Law (UCL) prohibits any "unlawful, unfair or fraudulent business act or practice." AT&T's business acts and practices complained of herein were unlawful, unfair, and fraudulent.

203. AT&T made material misrepresentations and omissions concerning its sale of access to and safeguarding of Mr. Shapiro's CPNI. As alleged fully above, a reasonable person would attach importance to the privacy of his sensitive account data in determining whether to contract with a wireless cell phone provider.

204. AT&T had a duty to disclose the nature of its inadequate security practices and failures in hiring, training, and supervising staff. AT&T had exclusive knowledge of material facts not known or knowable to its customers and it actively concealed these material facts from its customers.

205. Further, additional disclosures were necessary to materially qualify AT&T's representations that it did not sell consumer data and took measures to protect that data, and its partial disclosures concerning its use of customers' CPNI. AT&T was obligated to disclose its practices, as required by the FCA. The magnitude of the harm suffered by Mr. Shapiro underscores the materiality of AT&T's omissions.

206. A reasonable person, such as Mr. Shapiro, would be deceived and misled by AT&T's misrepresentations, which indicated that AT&T and its agents would not sell, and would in fact safeguard, its customers' personal and proprietary information.

207. AT&T intentionally misled AT&T customers regarding its data protection practices in order to attract customers and evade prosecution for its unlawful acts. Indeed, AT&T told Mr. Shapiro after each SIM swap attack that his account would be safe from future breaches, and in reliance on those assurances, Mr. Shapiro did not close his AT&T wireless account.

208. AT&T's actions detailed herein constitute an unlawful business act or practice. As alleged herein, AT&T's conduct is a violation of the California constitutional right to privacy, the FCA, and the CLRA.

209. AT&T's actions detailed herein constitute an unfair business act or practice.

210. AT&T's conduct lacks reasonable and legitimate justification in that Mr. Shapiro has been misled as to the nature and integrity of its goods and services and has suffered injury as a result.

211. The gravity of the harm caused by AT&T's 'practices far outweigh the utility of its conduct. AT&T's practices were contrary to the letter and spirit of the FCA and its corresponding regulations, which require cell carriers to disclose customers' CPNI only upon proper notice, consent, and authorization, and aims to vest carrier customers with control over their data. Due to the surreptitious nature of AT&T's actions, Mr. Shapiro could not have reasonably avoided the harms incurred as a result.

212. As the FCA establishes, it is against public policy to allow carrier employees and agents or other third parties to access, use, or disclose telecommunications customers' sensitive account information. The effects of AT&T's conduct are comparable to or the same as a violation of the FCA.

213. AT&T's' actions detailed herein constitute a fraudulent business act or practice.

214. As established herein, Mr. Shapiro has suffered economic harm as a result of AT&T's unfair competition. Additionally, had AT&T disclosed the true nature and extent of its data security and protection practices—and the flaws inherent in its systems—and its unwillingness to properly protect its customers, Mr. Shapiro would not have subscribed to or paid as much money for AT&T's 'wireless services.

215. Mr. Shapiro seeks injunctive and declaratory relief for AT&T's violations of the UCL. Mr. Shapiro seeks public injunctive relief against AT&T's unfair and unlawful practices in order to protect the public and restore to the parties in interest money or property taken as a result of AT&T's unfair competition. Mr. Shapiro seeks a mandatory cessation of AT&T's practices.

## COUNT III

### Violations of the California Constitutional Right to Privacy
### (Against all Defendants)

216. Mr. Shapiro realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

217. The California Constitution declares that, "All people are by nature free and

independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. Art. I, § 1.

218. Mr. Shapiro has a reasonable expectation of privacy in his mobile device and his AT&T account information. Mr. Shapiro reasonably expected that Defendants would not access or divulge his CPNI without authorization in light of AT&T policies and legal protections afforded to CPNI. Even before being SIM swapped, Mr. Shapiro had a five digit pincode for his account that Defendants assured him would protect his account from unauthorized changes. Mr. Shapiro received verbal assurances from AT&T employees and agents that his account would be protected from additional SIM swaps after the first occurrence.

219. Defendants intentionally intruded on and into Mr. Shapiro's solitude, seclusion, or private affairs by allowing its employees and agents and third parties to improperly access Mr. Shapiro's confidential CPNI without his permission. The sensitivity of Mr. Shapiro's CPNI is evidenced by its use to impersonate Mr. Shapiro and intercept the contents of his private text messages and the contents of his email accounts, financial accounts, and other accounts secured by private passwords.

220. Mr. Shapiro had a reasonable expectation of privacy not only in his CPNI but also in his online accounts that were accessed through use of his CPNI. Mr. Shapiro had a passcode on his iPhone that protected the content of his text messages; passwords on his email accounts that protected the content of his private email correspondence with his spouse, family members, friends, and business associates; passwords on his private notetaking application where he stored personal and professional confidential information; and passwords on his financial accounts that revealed his personal financial transactions, account balances, and business activities.

221. The reasonableness of Mr. Shapiro's expectations of privacy is supported by Defendants' unique position to safeguard his account data, including the sensitive and confidential information contained therein, and protect Mr. Shapiro from SIM swap

attacks.

222. Defendants' intrusions into Mr. Shapiro's privacy are highly offensive to a reasonable person. This is evidenced by federal legislation enacted by Congress and rules promulgated and enforcement actions undertaken by the FCC aimed at protecting AT&T customers' sensitive account data from unauthorized use or access. The offensiveness of the intrusion into Mr. Shapiro's privacy was heightened by the motives of AT&T employees and agents who sold access to Mr. Shapiro's mobile phone number and private data to hackers for criminal purposes.

223. The offensiveness of AT&T's conduct is also heightened by its material misrepresentations to Mr. Shapiro concerning the safety and security of his account.

224. Mr. Shapiro suffered great personal and financial harm by the intrusion into his private affairs, as detailed throughout this Complaint.

225. Defendants' actions and conduct complained of herein were a substantial factor in causing the harm suffered by Mr. Shapiro. But for AT&T employees and agents' involvement in a conspiracy to rob Mr. Shapiro and Defendants' subsequent failure to protect Mr. Shapiro from harm through adequate security and oversight systems and procedures, Mr. Shapiro would not have had his personal privacy repeatedly violated and would not have been a victim of SIM swap theft.

226. As a result of Defendants' actions, Mr. Shapiro seeks nominal and punitive damages in an amount to be determined at trial. Mr. Shapiro seeks punitive damages because Defendants' actions were malicious, oppressive, and willful. Defendants knew or should have known about the risks faced by Mr. Shapiro, and the grave consequences of such risks. Nonetheless, Defendants utterly failed to protect Mr. Shapiro, and allowed employees and agents to profit to his detriment. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

## COUNT IV

## Negligence

## (Against all Defendants)

227. Mr. Shapiro realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

228. Defendants owed a duty to Mr. Shapiro—arising from the sensitivity of his AT&T account information and the foreseeability of harm to Mr. Shapiro should AT&T fail to safeguard and protect such data—to exercise reasonable care in safeguarding his sensitive personal information. This duty included, among other things, designing, maintaining, monitoring, and testing AT&T's and its agents', partners', and independent contractors' systems, protocols, and practices to ensure, that Mr. Shapiro's information was adequately secured from unauthorized access.

229. Federal law and regulations, as well as AT&T's privacy policy, acknowledge AT&T's duty to adequately protect Mr. Shapiro's confidential account information.

230. Defendants owed a duty to Mr. Shapiro to protect his sensitive account data from unauthorized use, access, or disclosure. This included a duty to ensure that his CPNI was only used, accessed, or disclosed with proper consent.

231. Defendants owed a duty to Mr. Shapiro to implement a system to safeguard against and detect unauthorized access to Mr. Shapiro's AT&T data in a timely manner.

232. Defendants owed a duty to Mr. Shapiro to disclose the material fact that its data security practices were inadequate to safeguard Mr. Shapiro's AT&T account data from unauthorized access by its own employees and agents and others.

233. Defendants had a special relationship with Mr. Shapiro due to their status as his telecommunications carrier and its agents, which provided an independent duty of care. Defendants had the unique ability to protect their systems and the data accessed thereby or stored thereon from unauthorized access.

234. Mr. Shapiro's willingness to contract with AT&T, and thereby entrust AT&T with his confidential and sensitive account data, was predicated on the understanding that AT&T would undertake adequate security and consent precautions.

235. Defendants breached their duties by, inter alia: (a) failing to implement and

maintain adequate security practices to safeguard Mr. Shapiro's AT&T account and data—including his CPNI—from unauthorized access, as detailed herein; (b) failing to detect unauthorized access in a timely manner; (c) failing to disclose that AT&T's data security practices were inadequate to safeguard Mr. Shapiro's data; (d) failing to properly hire, train and supervise their employees and agents and prevent employees and agents from accessing and utilizing Mr. Shapiro's AT&T account and data without authorization; and (e) failing to provide adequate and timely notice of unauthorized access.

236. Defendants were also negligent in their authorization of Mr. Shapiro's SIM card swap. Defendants Synchronoss and AT&T knew or should have known that at least forty different AT&T numbers had been moved to the same cell phone (identified by its IMEI) in the months leading up to Mr. Shapiro's first SIM swap, knew or should have known that this was highly suspicious, but nevertheless, effectuated the transfer of Mr. Shapiro's AT&T account to this same cell phone. AT&T had the technical capacity to track this behavior—as reflected in its willingness to do so for law enforcement—but nonetheless failed to utilize it for the benefit and protection of Mr. Shapiro.

237. But for Defendants breaches of their duties, Mr. Shapiro's data would not have been accessed by unauthorized individuals.

238. Mr. Shapiro was a foreseeable victim of AT&T's inadequate data security practices and consent mechanisms. As alleged fully above, Defendants knew or should have known that SIM swaps presented a serious threat to its customers, including Mr. Shapiro, before Mr. Shapiro's account was breached for the first time. AT&T also knew or should have known that Mr. Shapiro was at a heightened risk after (1) he informed AT&T employees and agents that he had digital currency accounts, a risk factor AT&T has acknowledged, and (2) he had previously been the target of SIM swap attacks. Defendants also knew that improper procedures and systems to safeguard customer data could allow its employees and agents to authorize

customers' accounts and data and sell that to third parties, as occurred in the 2015 FCC enforcement action.

239. Defendants knew or should have known that unauthorized accesses would cause damage to Mr. Shapiro. AT&T admitted that unauthorized account access presents a significant threat to its customers, and became aware during its 2015 FCC enforcement action of the harms caused by unauthorized account access.

240. Defendants' negligent conduct provided a means for unauthorized individuals to access Mr. Shapiro's AT&T account data, take over control of his wireless phone, and use such access to hack into numerous online accounts in order to rob Mr. Shapiro and steal his personal information.

241. As a result of Defendants' failure to prevent unauthorized accesses, Mr. Shapiro suffered grave injury, as detailed herein, including severe emotional distress. This emotional distress arose out of Defendants' breach of their legal duties. The damages Mr. Shapiro suffered were a proximate, reasonably foreseeable result of such breaches of its duties. Therefore, Mr. Shapiro is entitled to damages in an amount to be proven at trial.

242. The injury and harm suffered by Mr. Shapiro was the reasonably foreseeable result of Defendants' failure to exercise reasonable care in safeguarding and protecting Mr. Shapiro's Personal Information, including his CPI and CPNI. Defendants' misconduct as alleged herein is malice, fraud or oppression under Civil Code § 3294(c)(1) and (2) in that it was despicable conduct carried on by Defendants with a willful and conscious disregard of the rights or safety of Mr. Shapiro and despicable conduct that has subjected Mr. Shapiro to cruel and unjust hardship in conscious disregard of his rights.  As a result, Mr. Shapiro is entitled to punitive damages against Defendants under Civil Code § 3294(a). Mr. Shapiro further alleges on information and belief that Bill O'Hern, who has been in charge of security at AT&T since 2016, and David S. Huntley, who has been in charge of privacy, had advance knowledge of the inadequacies of AT&T's security, the participation of

AT&T employees in evading or bypassing security, and they committed or ratified the acts of oppression, fraud or malice alleged herein.

## COUNT V

### Negligent Supervision and Entrustment

### (Against all Defendants)

243. Mr. Shapiro realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

244. Defendants conduct their business activities through employees and agents or other agents.

245. Defendants are liable for harm resulting from its agents' and employees and agents' conduct because they were reckless or negligent in employing and/or entrusting employees and agents—including, but not limited to, White and Jack—in work involving the risk of harm to others, including Mr. Shapiro.

246. As alleged herein, Defendants knew or had reason to believe that their employees and agents were unfit and nonetheless failed to exercise reasonable care in properly investigating. Defendants were negligent in supervising their employees and agents and in entrusting them with what they knew to be highly sensitive confidential information. Defendants knew or had reason to know that their employees and agents were likely to harm others in view of the work AT&T entrusted to them.

247. As alleged by law enforcement, White conducted 29 unauthorized SIM swaps and Jack conducted 12 swaps in the same month of Mr. Shapiro's first two SIM swaps. Nonetheless, on information and belief, AT&T failed to take appropriate action to prevent additional harm to its customers, including Mr. Shapiro. Additionally, AT&T was aware that Jack and White had the ability to access its customers' accounts, including Mr. Shapiro's account, and conduct SIM swaps, even without proper customer authorization. Nonetheless, AT&T failed to put any additional protections on customer accounts to prevent such swaps.

248. Upon information and belief, Defendants failed to exercise due care in

selecting their employees and agents, and thereby negligently or reckless employed them to do acts—including accessing customer accounts and effectuating SIM swaps—which necessarily brought them in contact with others, including Mr. Shapiro, while in the performance of those duties.

249. Defendants' acts, as alleged herein, were negligent in that they permitted unauthorized account access and SIM swapping.  These particular risks and hazards that Mr. Shapiro was exposed to are tied to Defendants' negligence and recklessness in employing, and continuing to employee through the time of Mr. Shapiro's injuries the representatives and agents who participated in the unauthorized SIM swaps.

250. Defendants also failed to properly supervise their employees and agents, and instead continued to negligently entrust them with sensitive customer data.  For example, had Defendants fired Jack and White when they first began to exhibit suspicious SIM swap activity—including but not limited to an irregularly high number of SIM swaps in a short period of time—Mr. Shapiro would not have been injured.

251. In addition, had AT&T built a system to effectively authenticate and verify consumer consent before allowing employees and agents to access their CPNI—as required by the FCA—Mr. Shapiro would not have been injured.

252. Had Defendants prevented individual employees and agents from unilaterally changing customer's SIM swaps without proper oversight, Mr. Shapiro would not have been injured.

253. In sum, Defendants gave their employees and agents the tools and opportunities they needed to gain unauthorized access to Mr. Shapiro's account and failed to prevent them from doing so, thereby allowing them to use AT&T's systems to perpetuate privacy breaches and thefts against Mr. Shapiro.

254. The actions of the representatives and agents who initiated the unauthorized SIM swaps on behalf of Defendants have a causal nexus to their employment. Mr. Shapiro's injuries arose out of his contract with AT&T as his carrier, and Defendants' resulting access to his CPNI and account data. The risk of injury to Mr. Shapiro was

1   inherent in Defendants' working environment.

2   255. Mr. Shapiro's injury was also foreseeable. As alleged fully above, Defendants

3   were aware of the risks that SIM swaps presented to their customers. Defendants were

4   also aware that their customers' accounts were vulnerable to unauthorized access to

5   and sale by their own employees and agents, as demonstrated in the 2015 FCC

6   enforcement action. Defendants were aware that Mr. Shapiro was at a heightened risk

7   due to his possession of cryptocurrency and the previous unauthorized SIM swaps

8   conducted in his AT&T account. Nonetheless, Defendants failed to take appropriate

9   steps to protect Mr. Shapiro, in violation of its duty.

10   256. The injury and harm suffered by Mr. Shapiro was the reasonably foreseeable

11   result of Defendants' failure to exercise reasonable care in safeguarding and

12   protecting Mr. Shapiro's Personal Information, including his CPI and CPNI. AT&T's

13   misconduct as alleged herein is malice, fraud or oppression under Civil Code §

14   3294(c)(1) and (2) in that it was despicable conduct carried on by AT&T with a

15   willful and conscious disregard of the rights or safety of Mr. Shapiro and despicable

16   conduct that has subjected Mr. Shapiro to cruel and unjust hardship in conscious

17   disregard of his rights.  As a result, Mr. Shapiro is entitled to punitive damages against

18   AT&T under Civil Code § 3294(a). Mr. Shapiro further alleges on information and

19   belief that Bill O'Hern, who has been in charge of security at AT&T since 2016, and

20   David S. Huntley, who has been in charge of privacy, had advance knowledge of the

21   inadequacies of AT&T's security, the participation of AT&T employees in evading or

22   bypassing security, and they committed or ratified the acts of oppression, fraud or

23   malice alleged herein.

24   **COUNT VI**

25   **Concealment**

26   **(Against AT&T)**

27   257. Mr. Shapiro realleges and incorporates all of the preceding paragraphs as

28   though fully set forth in this cause of action.

258. As alleged above, AT&T, including Chief Security Officer Bill O'Hern and Chief Compliance Officer David S. Huntley, who are respectively in charge of AT&T's security and privacy protections, knew that its data security measures were grossly inadequate, that its employees and agents could readily bypass the procedures, that its employees actively cooperated with hackers and thieves, and that it was incapable of living up to its commitments to consumers, including to Mr. Shapiro, under state and federal law, as well as under its own Privacy Policy, to protect his Personal Information, including CPI and CPNI.

259. Mr. Shapiro was unaware that AT&T's security measures did not include low cost and readily available solutions which would have prevented his SIM swap and resulting theft.

260. AT&T, including Mr. O'Hern and Mr. Huntley, knew or should have known from prior incidents and contacts with law enforcement that its system was subject to SIM swap fraud, that its employees cooperated with hackers in such fraud, that such fraud was prevalent in the cryptocurrency community, and that its security measures were ineffective in preventing the fraud.  Mr. O'Hern should have been well aware of this because he is in charge of security and AT&T and Mr. Huntley should have known because he is in charge of insuring that AT&T protects the privacy of its customers.

261. AT&T did not disclose these things to Mr. Shapiro and willfully deceived Mr. Shapiro by concealing the true facts concerning its data security, which AT&T was legally obligated and had a duty to disclose. It did so in order to induce Mr. Shapiro to remain as its customer.

262. Had AT&T disclosed the true facts about its dangerously poor data security practices and that is was motivated to profit from SIM swaps rather than correct the problem, Mr. Shapiro would have taken further measures to protect himself and would have ceased being a customer of AT&T.

263. Mr. Shapiro justifiably relied on AT&T to provide accurate and complete

information about its data security in continuing to be AT&T's customer.  Rather than disclosing the inadequacies in its security, including the additional security it encouraged Mr. Shapiro to place on his account, AT&T willfully suppressed any information relating to such inadequacies.

264. AT&T's actions are "deceit" under Cal. Civ. Code § 1710 in that they are the suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact Because of the deceit by AT&T, it is liable under Cal. Civ. Code§ 1709 for "any damage which [Mr. Shapiro] thereby suffers."

265. Because of this deceit by AT&T, Mr. Shapiro's Personal Information, including his CPI and CPNI, as described above, was compromised by hackers and he was deprived of at least $1.9 million at the time, and valued much higher today because of the increase in cryptocurrency values. The connection between AT&T, the SIM swap and the loss of Mr. Shapiro's funds is alleged hereinabove. In addition, Mr. Shapiro's Personal Information is now easily available to hackers, including through the Dark Web. Mr. Shapiro is further damaged to the extent of the amounts that he has paid AT&T for wireless services, because those services were either worth nothing or worth less than was paid for them because of lack of security. Mr. Shapiro has also suffered substantial out-of-pocket costs because of AT&T's inadequate security.

266. Because AT&T's deceit is fraud under Civil Code § 3294(c)(3) ,and AT&T's conduct was done with malice, fraud and oppression, Mr. Shapiro is entitled to punitive damages under Civil Code § 3294(a). Mr. Shapiro further alleges on information and belief that Bill O'Hern, who has been in charge of security at AT&T since 2016, and David S. Huntley, who has been in charge of privacy, had advance knowledge of the inadequacies of AT&T's security, the participation of AT&T employees in evading or bypassing security, and they committed or ratified the acts of oppression, fraud or malice alleged herein.

**COUNT VII**

**Violation of the Computer Fraud and Abuse Act**

**18 U.S.C. § 1030**

**(Against all Defendants)**

267. Mr. Shapiro realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

268. Mr. Shapiro's mobile device is capable of connecting to the Internet.

269. Defendants' employees, representatives and agents, in the scope of their employment, intentionally accessed Mr. Shapiro's mobile device, and assisted others in accessing his mobile device, without Mr. Shapiro's authorization, in order to assist hackers in their theft from Mr. Shapiro.

270. Defendants' employees, representatives and agents, took these actions knowing that they could or would cause damage to Mr. Shapiro's mobile device, as well as damage to the information located on his mobile device.

271. Defendants' employees, representatives and agents, caused Mr. Shapiro's mobile device and much of the data on it to be unusable to him.

272. Because of the Defendants' employees' actions, Mr. Shapiro suffered damage to his mobile device and damage to information on his mobile device, including being unable to access information and data on his mobile device and being unable to access his personal accounts, including his personal (e.g. Evernote and G-mail) and financial (e.g. cryptocurrency and PayPal) accounts.

273. The act of swapping Mr. Shapiro's AT&T wireless SIM card was in the scope of the Defendants' employees' work.

274. Further, Mr. Shapiro spent in excess of $5,000 investigating who accessed his mobile device and damaged information on it.

**VII. PRAYER FOR RELIEF**

275. WHEREFORE, Plaintiff Seth Shapiro requests that judgment be entered against Defendant and that the Court grant the following:

A. Judgment against Defendant for Plaintiff's asserted causes of action;

B. Public injunctive relief requiring cessation of Defendants' acts and practices complained of herein pursuant to, inter alia, Cal. Bus. & Prof. Code § 17200, 47 U.S.C. § 401(b), and Cal. Civ. Code § 1780;

C. Pre- and post-judgment interest, as allowed by law;

D. An award of monetary damages, including punitive damages, as allowed by law;

E. Reasonable attorneys' fees and costs reasonably incurred, including but not limited to attorneys' fees and costs pursuant to 47 U.S.C. § 206; and

F. Any and all other and further relief to which Plaintiff may be entitled.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable.

Dated:  April 5, 2021                    AFFELD GRIVAKES LLP

By: s/ Christopher Grivakes
_____
Christopher Grivakes

Attorney for SETH SHAPIRO

THIRD AMENDED COMPLAINT