CHRISTOPHER GRIVAKES
  cg@agzlaw.com
AFFELD GRIVAKES LLP
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310.979.8700
Facsimile: 310.979.8701

Attorney for Plaintiff SETH SHAPIRO

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| SETH SHAPIRO,<br><br>          Plaintiff,<br><br>  v.<br><br>AT&T MOBILITY LLC, et al.<br><br>          Defendants. | CASE NO. 2:19-CV-08972-CBM-FFM(x)<br><br>**PLAINTIFF'S OPPOSITION TO AT&T MOBILITY'S MOTION TO DISMISS THIRD AMENDED COMPLAINT**<br><br>Date: July 20, 2021<br>Time: 10:00 a.m.<br>Court: 8B |

Plaintiff SETH SHAPIRO ("Shapiro") hereby submits his Opposition to the Motion to Dismiss filed by AT&T MOBILITY LLC ("AT&T") with respect to the Sixth Count for Concealment in the Third Amended Complaint ("TAC").

## I.   AT&T's Contentions

AT&T's motion to dismiss is based on two contentions: (1) that Shapiro failed to plead a duty to disclose, and (2) that Shapiro failed to plead that he was unaware of the undisclosed facts and would have acted differently.  Neither contention has merit.

## II.   AT&T Had A Duty To Disclose Its Decision To Not Implement Basic Security Measures To Combat SIM Swaps And Instead Profit From The Problem

As AT&T acknowledges, the duty to disclose arises when: (1) there is a fiduciary relationship; (2) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed or which render disclosure likely to mislead; (3) the facts known or only accessible only to defendant, who knows they are not known or reasonably discoverable by plaintiff;  and (4) the defendant actively conceals discovery from plaintiff.  *Warner Constr. Corp. v. L.A.* (1970) 2 Cal.3d 285, 294.  AT&T had a duty to disclose under categories (2) and (3), as addressed below.

### A.   AT&T Had Duty To Disclose Since It Had Exclusive Possession Of The Failure To Implement Basic Security Measures

AT&T's motion to dismiss completely ignores the central allegations of Shapiro's concealment claim --  that AT&T had not implemented *basic* security measures to prevent unauthorized SIM swaps because it wanted to profit from the problem.  AT&T invested hundreds of million in a joint venture with the other major carriers to profit from the SIM swap problem by marketing an app that shared SIM swap data with financial institutions so that they could block a transfer of funds within "x" time of a SIM swap.

The TAC alleges that AT&T failed to implement the following *basic* security measures to combat SIM swaps:  (i) using location detection to verify that the caller

was in the same location as the phone for which the SIM swap was being requested (TAC, ¶150(a));  (ii) sending a text message to authenticate the person requesting the SIM swap (TAC, ¶150(b)); (iii) sending an email to authenticate the person requesting the SIM swap (TAC, ¶150(c)); (iv) using voice biometrics to authenticate a caller requesting a SIM swap over the phone (TAC, ¶150(d); and (v) sharing real-time data with financial institutions to prevent theft once an unauthorized SIM swap has occurred so that the institution can block a requested currency transfer if there has been a SIM swap within a specified time frame (*e.g.*, within 48 hours of the transfer request), since a very recent SIM swap combined with a withdrawal request is a strong indicator of fraud (TAC, ¶150(e)).

The TAC also alleges that AT&T didn't implement the foregoing basic security measures because it had invested hundreds of millions in a for-profit venture now known as ZenKey which is being marketed to banks and other financial institutions as a ***post-SIM swap*** solution to prevent the theft of funds ***after*** a SIM swap has occurred. (TAC, ¶¶ 152-154).  However, AT&T has not had any success in marketing ZenKey to any financial institutions. (Id.). The foregoing allegations are plausible because they are largely derived from ZenKey's own publicly available data as referenced in the TAC (¶¶152-154, fns. 115-124) (Shapiro notes that ZenKey recently changed its website content to de-emphasize the central role that unauthorized SIM swaps played in its messaging; however, the original content remains available on archive.org.).

The Sixth Count for concealment incorporates the foregoing allegations, and further alleges that ATT had "dangerously poor data security practices and that i[t] was motivated to profit from SIM swaps rather than correct the problem" (TAC, ¶262); knew that "its security measures were ineffective in preventing the fraud" (¶260); that "Mr. Shapiro was unaware that AT&T's security measures did not include low cost and readily available solutions which would have prevented his SIM swap and resulting theft" (TAC, ¶259); and had AT&T made such disclosures "Mr. Shapiro would have taken further measures to protect himself and would have ceased being a

customer of AT&T."

AT&T had *exclusive* knowledge of the measures that it had failed and refused to implement, and its reasons for doing so. The vague and general disclosures in the Privacy Policy were not sufficient to inform Shapiro that AT&T had not implemented the basic security measures referenced above. The Privacy Policy, attached to the TAC as Exhibit G, contains the following disclosures at pages 25-26:

> ***We've worked hard to protect your information***. ***And we've established electronic and administrative safeguards designed to make the information we collect secure***. Some examples of those safeguards include:
>
> - ***We've implemented technology and security features and strict policy guidelines to safeguard the privacy of your Personal Information***. Some examples are:
>   - Maintaining and protecting the security of computer storage and network equipment, and using our security procedures that require employee user names and passwords to access sensitive data;
>   - Applying encryption or other appropriate security controls to protect Personal Information when stored or transmitted by us;
>   - Limiting access to Personal Information to only those with jobs requiring such access; and
>   - Requiring caller/online authentication before providing Account Information so that only you or someone who knows your Account Information will be able to access or change the information.
>   - Although *we strive* to keep your Personal Information secure, no security measures are *perfect*, and we *cannot guarantee* that your Personal Information will never be disclosed in a manner inconsistent with this Policy (for example, as the result of unauthorized acts by third parties that violate the law or this Policy)

None of the foregoing disclosures in the Privacy Policy can reasonably be construed to have put Shapiro on notice that AT&T had failed to implement basic, low-cost measures to prevent SIM swaps. The disclosure that its security was not

"perfect" is less than revealing: nothing is perfect. The disclosure that AT&T can't "guarantee" that "Personal Information" will never be disclosed *doesn't even mention SIM swaps*. AT&T's motion misdirects attention to the fact that Shapiro knew that an unauthorized SIM swap was *possible*. Knowing that an unauthorized SIM swap *can* occur is very different than knowing that your carrier has not taken *basic* steps to prevent such an occurrence such that the risks are dramatically increased.

AT&T cannot dispute that it had sole knowledge of (i) the actual measures implemented to prevent unauthorized SIM swaps; (ii) its failure and refusal to implement basic and low-cost solutions; and (iii) that it was seeking to profit from the SIM swap problem by investing hundreds of millions into a post-SIM swap solution that is being marketed to every financial institution in the country.

### B. AT&T's Misleading Representations About Security

AT&T's representations in its Privacy Policy, as set forth above, were misleading for the following reasons:

*First*, AT&T gave the false impression that it was doing everything in its power to precent security violations: "… **we strive** to keep your Personal Information secure." However, it failed to disclose that it had **not** implemented **basic** security measures, referenced above, *i.e.*, location detection to verify that the caller was in the same the location as the phone for which the SIM swap was being requested; sending a text message to authenticate the person requesting the SIM swap; sending an email to authenticate the person requesting the SIM swap; using voice biometrics to authenticate a caller requesting a SIM swap over the phone; and sharing real-time data with financial institutions to prevent theft once an unauthorized SIM swap has occurred so that the institution can block a requested currency transfer.

*Second*, AT&T's disclosure that "no security measures are **perfect**" does not reveal the truth: that basic measures had not been implemented. The disclosure that AT&T "cannot **guarantee** that your Personal Information will never be disclosed in a manner inconsistent with this Policy (for example, as the result of unauthorized acts by

third parties that violate the law or this Policy)" does not absolve AT&T of responsibility.   This disclosure does *not even address the risk of SIM* swaps and does not reveal that AT&T failed and refused to implement basic security measures to prevent unauthorized SIM swaps because it had decided instead to profit from the SIM swap problem instead of preventing it.

AT&T's reliance on a decision in the *Terpin* case is misplaced.  The *Terpin* Complaint did **not** include allegations that AT&T had failed to implement basic security measures, and had instead decided to profit from the SIM swap problem rather than prevent it, as alleged in the TAC.

### III.  Shapiro Adequately Pled That He Was Unaware Of The Facts And Would Have Acted Differently Had He Known The Truth

Contrary to AT&T's allegation, Shapiro has adequately pled that he was unaware of the key facts.  AT&T engages in misdirection when it equates Shapiro's knowledge that an unauthorized SIM swap can occur with his supposed knowledge of the *charging allegations that AT&T had not implemented the basic security measures referenced above because it wanted to profit from the problem rather than fix it*. AT&T is comparing apples to oranges.  Shapiro did not know, and could not have known, that AT&T was paying lip service to the SIM swap problem because it wanted to make money from it.

Shapiro has adequately and plausibly pled that he would have acted differently had he known the truth: "Had AT&T disclosed the true facts about its dangerously poor data security practices and that is was motivated to profit from SIM swaps rather than correct the problem, Mr. Shapiro would have taken further measures to protect himself and would have ceased being a customer of AT&T." (TAC, ¶262).

### IV.  Conclusion

For all the foregoing reasons Shapiro requests that the motion to dismiss be denied.

| | | |
|---|---|---|
| 1 | DATED: June 22, 2021 | CHRISTOPHER GRIVAKES<br>AFFELD GRIVAKES LLP |
| 2 | | |
| 3 | | By: /s/ *Christopher Grivakes* |
| 4 | | Christopher Grivakes |
| 5 | | Attorneys for Plaintiff SETH SHAPIRO |